In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2947

Jerry W. Slusser, First Republic Financial
Corporation, and First Republic Trading
Corporation,

Petitioners,

v.

Commodity Futures Trading Commission,

Respondent.

Petition for Review of an Order of the
Commodity Futures Trading Commission

Argued February 22, 2000--Decided April 24, 2000

Before Coffey, Easterbrook, and Williams, Circuit
Judges.

Easterbrook, Circuit Judge.  During the spring of
1989, Jerry Slusser and entities he controls came
into possession of approximately $29 million that
German investors had entrusted to International
Participation Corporation (IPC) for investment in
American financial markets. IPC raised the money
using a prospectus offering investors a choice
from a number of portfolios. Portfolios III and
IV were to be invested in financial futures
traded on a public exchange. Investors were to
receive 65% of all profits; IPC was entitled to
the other 35% (plus a 10% surcharge at the time
of the initial investment) to cover all operating
expenses and trading commissions. Fund III was to
stop trading if it lost 10% of invested funds
(disregarding the 10% surcharge); Fund IV was to
stop losses at 35% of investment. After he gained
control of the $29 million, however, Slusser and
his firms (collectively "Slusser") disregarded
these promises. He charged hefty commissions
against the pooled funds; he invested part of the
money in securities and another part in corporate
acquisitions (two trading corporations that
Slusser treated as his own property); he kept
trading long after the stop-loss marks had been
passed. Slusser repeatedly lied to German
authorities in order to extend his control of the
pool. A kitty that had been approximately $29

million in May 1989 dwindled to $16 million by November, when Slusser ceased the churning and wired the remaining funds to Germany. For these events Slusser has been banned for life from U.S. futures markets and fined $10 million by the Commodity Futures Trading Commission. 1999 CFTC Lexis 167, Comm. Fut. L. Rep. para.27,701 (July 19, 1999). He wants us to set aside the CFTC's order.

The CFTC found that Slusser had violated the Commodity Exchange Act, 7 U.S.C. sec.sec. 1-25, in three principal ways. First, he failed to register with the CFTC as a "commodity pool operator" and its "associated person" even though he was managing a commodity pool--initially on behalf of IPC, then after the end of May 1989 in his own right, following a contractual assumption of IPC's position. See sec.sec. 4k(2), 4m of the Act, 7 U.S.C. sec.sec. 6k(2), 6m. Second, after assuming IPC's duties to the investors Slusser failed to adhere to the contractual limitations the prospectus placed on use of the funds, and in the process violated the Act and the implementing regulations by charging more than $3 million in improper commissions, devoting money to uses other than those allowed by the prospectus, commingling pool funds, and diverting investors' money to personal purposes. See sec.4o(1) of the Act, 7 U.S.C. sec.6o(1), and 17 C.F.R. sec.4.20. Third, Slusser committed multiple frauds. See sec.4b(a) of the Act, 7 U.S.C. sec.6b(a). Many of the tall tales were told to German authorities in order to buy time. For example, at the end of May 1989 Slusser told the Germans that trading had so far been profitable and that investors would suffer substantial losses if the futures contracts were liquidated prematurely. In July Slusser wrote to a German criminal prosecutor that "many of the traded instruments will mature over the next 90 days. We project profits from these positions at maturity, but there will be substantial reductions in value if prematurely liquidated." The assertions about profits to date were false, and the remaining assertions were nonsense, designed to deceive persons ignorant about futures markets. Contracts traded on public exchanges (as these were) do not "mature" and are not "liquidated"; they either expire or are closed by acquiring offsetting positions, which realizes all accrued gain or loss without penalty for "premature" action. See generally Chicago Board of Trade v. SEC, 883 F.2d 525 (7th Cir. 1989). Slusser knew this well. The positions that he told the German official must be left undisturbed for 90 days soon were closed, and the accounts were turned over many times (with commissions deducted for each turn) before Slusser finally distributed the residue.

Slusser's principal response is to assert, as if it were incontestable truth, a view of matters that the administrative law judge and the Commission found incredible, irrelevant, or both. For example, Slusser insists that he did not know about the promises IPC made in the prospectus regarding the uses of the funds and the way the pool manager would be compensated; indeed, Slusser insists that for many months he did not know anything about the funds' origin, and that when he learned their general source he did not know that the $29 million represented the proceeds of Funds III and IV rather than other pools mentioned in the prospectus. The ALJ concluded, on the basis of substantial evidence (including not only the contract by which Slusser assumed all of IPC's obligations but also documents showing that Slusser had an account at Commerzbank Dusseldorf into which investors deposited funds), that Slusser knew no later than June 1, 1989, exactly what his obligations as the pool's new manager were. But suppose this is wrong, and Slusser never learned the provenance of the funds. Then what was he doing trading at a riotous pace, rather than purchasing safe vehicles such as Treasury bills until the money's owner could be determined? Slusser made the most of an opportunity to charge big commissions without supervision. The CFTC as regulator of pool operators is entitled to require more conscientious management of unknown investors' money.

Although the CFTC's findings of fact are supported by substantial evidence, Slusser insists that they are legally insufficient to prove that he committed fraud. Slusser lied to IPC when he promised to manage the funds according to the prospectus; he lied to German officials when he said that premature liquidation would turn profits into losses; he lied to the investors in a letter sent in July 1989 asserting that his management of the funds had been successful (it had been quite unprofitable--except to Slusser), that he was subject to regulatory oversight (neglecting to mention his failure to register with the CFTC), and that the principal would be returned by September (Slusser clung to the money until November, when the investors and German officials induced him to hand over the remainder by promising not to prosecute him for his conduct). Still, Slusser insists, he is not culpable, because none of these persons testified that he relied on Slusser's statements--and reliance is an element of fraud, at least in private litigation where the plaintiff must show causation. See, e.g., Basic, Inc. v. Levinson, 485 U.S. 224, 243 (1988) (securities litigation); Restatement (2d) of Torts sec.sec. 525, 548 (1977). We may assume that a causal chain from

deceit to injury also is essential in private actions under 7 U.S.C. sec.25, which requires the plaintiff to show "actual damages" attributable to a violation of the Act, and that reliance is the usual way to show causation.

   Must the public prosecutor show that a private person was taken in? In criminal prosecutions the answer is no, unless the statute expressly makes reliance an element of the offense. See Neder v. United States, 527 U.S. 1 (1999) (prosecution for mail, wire, tax, and bank frauds). Three courts of appeals have reached the same conclusion for fraud actions prosecuted by the SEC under sec.10(b) of the Securities Exchange Act, 15 U.S.C. sec.78j(b). SEC v. North American Research & Development Corp., 424 F.2d 63, 84 (2d Cir. 1970); SEC v. Blavin, 760 F.2d 706, 711 (6th Cir. 1985); SEC v. Rana Research, Inc., 8 F.3d 1358, 1363-64 (9th Cir. 1993). Reliance, unlike the "connection" between the misconduct and a purchase or sale of securities, see Aaron v. SEC, 446 U.S. 680 (1980), is not a statutory element and therefore is not an essential part of an administrative case. Is there any reason to treat administrative prosecutions under the Commodity Exchange Act differently? Slusser observes that sec.10(b) of the Securities Exchange Act prohibits not only deceptive but also manipulative devices, while sec.4b of the Commodity Exchange Act does not refer to manipulation. True enough, but nothing turns on this; Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), concluded that the plaintiff in all private sec.10(b) actions must demonstrate the ingredients of common-law fraud. When it held in Basic that reliance is one of these elements, the Court did not suggest that matters would differ if the plaintiff stressed "manipulation" rather than "fraud"; it is better to say that manipulation is a species of fraud. North American Research, Blavin, and Rana Research hold that there is a difference between private and public actions, not that there is a difference between "fraud" and "manipulation."

   Section 4b of the Commodity Exchange Act does differ from sec.10(b) of the Securities Exchange Act, but the differences all favor the CFTC. For example, although sec.10(b) does not prohibit attempted deceits, and this is a good reason why a private plaintiff must show actual reliance rather than just a potential for reliance, sec.4b(a)(i) makes it actionable "to cheat or defraud or attempt to cheat or defraud such other person" (emphasis added). Perhaps, then, it is unnecessary to show reliance even in a private action--for an attempt that fails (perhaps because no one relied on it) is nonetheless a violation of sec.4b(a)(i). Section 4b(a)(ii)

reinforces this possibility by declaring that it is unlawful "willfully to make or cause to be made to such other person any false report or statement", and sec.4b(a)(iii) adds that it is forbidden "willfully to deceive or attempt to deceive such other person by any means whatsoever". Slusser made (or caused to be made) many false statements; these may be condemned under sec.4b(a)(ii) and (iii) without proof of reliance even if the CFTC did not establish all elements of common-law "fraud." See also Philip McBride Johnson & Thomas Lee Hazen, II Commodities Regulation sec.5.08[17][B] at 5-165 n.821 (3d ed. 1998) (concluding that the CFTC need not establish reliance).

Although none of Slusser's other objections to the CFTC's decision on the merits requires comment, there is a serious problem with the $10 million fine. Section 6(c)(3) of the Act, 7 U.S.C. sec.9(3), permits the Commission to "assess . . . a civil penalty of not more than the higher of $100,000 or triple the monetary gain to such person for each such violation". The Commission justified the $10 million penalty as appropriate in relation to Slusser's gain but did not notice that the treble-gain provision entered the Act in 1992. Section 212(b) of Pub. L. 102-546, 106 Stat. 3609. Back in 1989, when Slusser was managing the funds, the maximum penalty was $100,000 per violation. Only clear statutory language justifies retroactive application of an increase in damages or civil penalties, see Landgraf v. USI Film Products, 511 U.S. 244 (1994), and nothing in the 1992 amendments so much as hints at retroactivity. Thus the maximum penalty is $100,000 per violation. The complaint filed by the Division of Enforcement listed only six violations. Most of the violations narrated by the complaint entail multiple acts or statutes; it would have been easy to separate the events into tens if not hundreds of violations, or to allege that each day of managing the funds without registration as a commodity pool operator was a separate violation. But the CFTC's staff did not do any of these things, perhaps because 7 U.S.C. sec.13b implies that fines for each day of a series of violations are appropriate only after the CFTC has issued a cease-and-desist order. Just as the sentence in a criminal case is limited by the number of counts alleged in an indictment times the maximum punishment for each offense, so the penalty in an administrative prosecution is limited by the number of violations alleged in the complaint times the maximum fine per violation. A reasonable person in Slusser's position would have assumed that his maximum exposure was $600,000 and financed his defense accordingly.

Despite our convenient use of "Slusser" as a placeholder for Jerry Slusser, his associates, and the firms he controlled, there were quite a few participants in this scheme, and three remain as petitioners in this court--Slusser personally and two corporations. The statutory cap applies person-by-person, as well as violation-by-violation, so the CFTC may be able to justify a total penalty as high as $1.8 million, though it may have considerable trouble collecting from the defunct corporations. This potential trouble shows one way in which knowing the maximum penalty might have affected the administrative litigation. Until the 1992 amendment deleted it, 7 U.S.C. sec.9a contained this language:

In determining the amount of the money penalty . . . , the Commission shall consider, in the case of a person whose primary business involves the use of the commodity futures market--

the appropriateness of such penalty to the size of the business of the person charged, the extent of such person's ability to continue in business, and the gravity of the violation;

and in the case of a person whose primary business does not involve the use of the commodity futures market--

the appropriateness of such penalty to the net worth of the person charged, and the gravity of the violation.

The two corporate parties, at least, are covered by the first of these clauses, which courts generally call the "collectibility" condition. Slusser believes that he personally comes within the second clause, so that the Commission must consider the appropriateness of the penalty in light of his net worth. Yet the record does not contain any information on Slusser's net worth, the size of the two corporate parties, or the effect of any penalty on their ability to continue in business.

Each side blames the other for this deficiency. Slusser contends that the CFTC has both the burden of production and the burden of persuasion; the CFTC asserts that Slusser had the burden of production and that, because he (and the two corporations) kept mum, the burden of persuasion became irrelevant. Perhaps Slusser adopted his strategy of silence because he anticipated a $600,000 maximum penalty and feared that evidence about net worth would embolden the Commission to demand the full $600,000. But that's just speculation. All we know is that the record is

empty.

When casting the burden of production on Slusser and the firms, the CFTC cited two of its decisions. In re Grossfeld, Comm. Fut. L. Rep. para.26,921 at 44,465-66 (CFTC Dec. 10, 1996); In re Rothlin, Comm. Fut. L. Rep. para.21,851 at 27,573 (CFTC Dec. 21, 1981). The Commission's opinion did not mention Gimbel v. CFTC, 872 F.2d 196 (7th Cir. 1989), which disapproved that position, at least with respect to the collectibility consideration for futures traders. Gimbel holds that the Commission's Division of Enforcement has the burden of production and must introduce evidence about the net worth of the person who will be called on to pay a financial penalty. Because "the Division failed to meet its burden of establishing the collectibility of the proposed penalty", 872 F.2d at 201, we vacated the financial sanction. Accord, Premex, Inc. v. CFTC, 785 F.2d 1403, 1409 (9th Cir. 1986). Neither the CFTC's opinion, which ignored both Gimbel and Premex, nor the CFTC's brief in this court, which cites Gimbel only for the uncontested proposition that an opportunity to offer evidence satisfies the due process clause, suggests any reason why the burden of production with respect to a person's net worth should be allocated differently from the burden of production with respect to the collectibility of a penalty imposed on a commodity futures trader. The Act is silent on the burden of production, so we would have been attentive to an argument that Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), permits the Commission to regulate that aspect of its own proceedings, provided it shoulders the burden of persuasion in the end. See Director, OWCP v. Greenwich Collieries, 512 U.S. 267 (1994); Steadman v. SEC, 450 U.S. 91 (1981). See also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519 (1978). By placing its head deep in the sand, and refusing to acknowledge the adverse judicial views, the Commission disabled itself from making such a pitch. If it wants to impose any financial penalty on these parties, the CFTC must bear both the burden of production and the burden of persuasion on collectibility and net worth.

The order of the Commission is enforced to the extent it revokes the registrations of, and bans trading by, the three petitioners, and orders them to cease and desist from further violations of the Act. The petition for review is granted to the extent the Commission imposed financial penalties, and the matter is remanded for proceedings consistent with this opinion.