[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Aug. 29, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-14592

_____

D. C. Docket No. 05-80002-CV-DTKH

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff-Appellee,

versus

JAY M. LEVY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(August 29, 2008)**

Before TJOFLAT and MARCUS, Circuit Judges, and VINSON,[*] District Judge.

---

[*]    Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

MARCUS, Circuit Judge:

Jay M. Levy appeals from a final judgment entered by the United States District Court for the Southern District of Florida after a bench trial, finding him liable for multiple acts of solicitation fraud in violation of Section 4c(b) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 6c(b) (2000),[1] and imposing various sanctions against him. Levy contends that the court erred in (1) multiplying the maximum civil monetary penalty for which he was liable by the number of "violations" proved at trial, rather than by the number of "counts" alleged in the complaint; (2) imposing a $600,000 civil monetary penalty against him; (3) awarding restitution to the extent of his customers' losses; (4) including in the restitution award $30,000 invested by his customers prior to their interactions with him; and (5) freezing his assets pending satisfaction of the judgment. After thorough review, we affirm in all respects the district court's final judgment except insofar as it made an award of restitution based on the amount of the victims' losses rather than on Levy's ill-gotten gains. As for that matter, we remand for further proceedings consistent with this opinion.

I.

The essential facts adduced at trial and found by the district court are these:

---

[1] Levy does not dispute any of the district court's liability findings.

2

United Investment Group ("UIG") is a Florida corporation located in Boca Raton, Florida. UIG is registered with the Commodity Futures Trading Commission ("CFTC") as an Introducing Broker ("IB"), which the Commodity Exchange Act defines as follows:

> [A]ny person . . . engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market . . . who does not accept any money, securities, or property . . . to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(23). Prior to the commencement of this action by the CFTC, UIG was engaged in the business of soliciting customers for the sale of commodities options through Universal Financial Holding Company ("UFHC"), a Futures Commission Merchant ("FCM").[2] UIG, which employed Associated Persons ("APs")[3] to conduct and manage its operations, hired Levy in this capacity in August 2003.

Before registering as an AP with UIG, Levy worked at four different options

---

[2]    As an IB, UIG never accepted money from its customers. Instead, customers sent their checks directly to UFHC. To make a trade, a customer placed his order with UIG; UIG processed the order at an order desk and forwarded it along to UFHC, which then executed the trade using the customer's available funds.

[3]    An AP is "any natural person who is associated . . . with . . . [a]n introducing broker . . . in any capacity which involves (i) the solicitation or acceptance of customers' or option customers' orders (other than in a clerical capacity) or (ii) the supervision of any person or persons so engaged[.]" 17 C.F.R. § 1.3(aa)(2).

trading firms, three of which were disciplined by the National Futures Association ("NFA")[4] as a result of sales practice violations. Levy himself has been the subject of two NFA Business Conduct Committee complaints, both of which resulted in the assessment of a $20,000 fine against him along with three months of enhanced supervisory procedures. In settling the second of these complaints, Levy consented to findings that, while serving as an AP at Group One Financial Services, Inc., he violated NFA Compliance Rule 2-2(a), which provides that no member shall cheat, defraud, or deceive, or attempt to cheat, defraud, or deceive, any commodity futures customer. In fact, Levy agreed that, in March and April 2001, he made a number of misleading and deceptive sales solicitations to a Group One customer, specifically telling the customer that a $17,000 investment in Japanese Yen options could suddenly be worth more than $300,000, and pressuring the customer to invest immediately before the market corrected itself.

The NFA's Business Conduct Committee found, and Levy agreed, that "[t]here was no rationale" for Levy's recommendations that the customer purchase additional Yen put options "except to generate commissions for Group One." The Committee also found, and again Levy agreed, that his solicitation "painted a

_____

[4] The NFA is a wholly independent regulatory organization for the U.S. futures industry. Membership in the NFA is mandatory for all entities conducting business on U.S. futures exchanges.

misleading and overly optimistic picture of the profit potential of trading Yen put options." Finally, the Conduct Committee concluded that Levy's solicitations included no discussion of the enormous risks and speculative nature of options trading.

On January 3, 2005, the CFTC commenced this injunctive action against UIG and five of its APs, including Levy (collectively "the Defendants"), asserting that the Defendants misrepresented the profit potential of commodities options in violation of 7 U.S.C. § 6c(b)[5] and 17 C.F.R. § 33.10 (2005).[6] Specifically, the

---

[5]    That Section of the CEA provides as follows:

> No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty", contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.

7 U.S.C. § 6c(b).

[6]    In pertinent part, the CEA's implementing regulations, drafted by the CFTC, state:

> It shall be unlawful for any person directly or indirectly:
> (a) [t]o cheat or defraud or attempt to cheat or defraud any other person;
> . . .
> (c) [t]o deceive or attempt to deceive any other person by any means whatsoever
> in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

17 C.F.R. § 33.10(a) and (c).

complaint alleged, among other things, that the Defendants "fraudulently solicited members of the public to open [accounts] by misrepresenting and failing to disclose material facts concerning . . . (i) the likelihood that a customer would realize large profits from trading options; (ii) the risks involved in trading options; and (iii) the dismal performance record of UIG customers trading options."

The district court tried this case without a jury in March 2006. Two days into the trial, the CFTC entered into a Consent Decree with all of the Defendants except Levy, whose trial resumed as scheduled. Soon after concluding the trial as to Levy, the district court entered detailed findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and then entered final judgment against Levy. The court found that, since at least August 2003, Levy's responsibilities at UIG included soliciting investments from members of the general public for the purpose of trading commodity options. Generally, the district court explained, a more junior AP would contact the potential customer and misrepresent the risks and potential rewards associated with commodity options trading before turning the customer over to Levy who, stressing his expertise, would guarantee lofty returns at limited cost with little or no risk.

At trial, Levy vehemently denied engaging in any of these impermissible sales ploys; indeed, at one point, he suggested that every witness who testified

6

against him was "absolutely lying." CFTC v. United Investors Group, Inc., No. 05-80002, at 7 (S.D. Fla. 2006). Far from misleading clients with talk of large profits and non-existent risk, he claimed to have required that all of his clients acknowledge the significant risks associated with commodity options before placing trades.

The district court, however, found Levy's testimony "incredible," describing his memory as "selective" and lamenting his professed inability to recall "any specifics regarding the 'few' improper sales solicitations he admitted to making, or the improper sales solicitations he recalls witnessing at UIG." United Investors Group, Inc., No. 05-80002, at 7. The court added that Levy's testimony was "rife with internal inconsistencies tripped by his self serving memorializations of material events." Id. Thus, for example, Levy initially denied consenting to any findings of fact in resolving any claim brought by the NFA's Business Conduct Committee, before finally admitting, after the evidence was squarely presented, that a fraudulent and misleading exchange between himself and a Group One customer had actually occurred. Id. at 8. The trial court found that Levy was "evasive" about the amount of money he earned during his tenure at UIG. Id. In particular, while Levy's bank records indicated that "he received and endorsed checks totaling $416,691.30 from UIG bank accounts," he unabashedly argued,

without further elaboration, that he derived these amounts from other sources. Id. Finally, the district court found that Levy's testimony was belied by the testimony of five UIG customers (Scott Anderson, Carrie Allsopp, David Cuthbertson, Charles Jeffrey Thompson, and Sergeant Lanzy Williams) who received sales calls from him and provided a sinister account of his solicitation tactics. Id.

Thus, for example, Anderson, who was fully credited by the district court, testified that he was contacted in March 2004 by Tony Bobba, a UIG AP, who advised him that the war in Iraq would cause a substantial appreciation in the value of unleaded gasoline calls. Relying upon this information, Anderson opened a trading account with UFHC, through which he purchased $5,000 worth of unleaded gasoline options. On March 29, 2004, Bobba contacted Anderson again, only this time to set up a call with Levy -- a "commodities guru" who, according to Bobba, lived in an affluent neighborhood and drove expensive cars. Bobba told Anderson that Levy consistently purchased Euro currency options at a discounted price because, in addition to buying in large quantities, Levy had close ties with Europe's financial markets.

The next day, Levy called Anderson himself and moved in for the kill. He engaged in what the district court called "a high-pressure sales solicitation." United Investors Group, Inc., No. 05-80002, at 9. Levy said that he had

8

connections in the European financial community and added that he was an expert in Euro currency options. Levy strongly suggested that Anderson purchase Euro currency options as soon as possible in light of the upcoming 2004 presidential election and the ongoing war in Iraq. Levy guaranteed Anderson that his investment would soon triple, irrespective of any volatility in the markets, because of Levy's strategy of hedging put and call options. Levy further told Anderson that "[I] may sound like an ass right now, but [you] will thank [me] after all of the money [you] made." Based on Levy's representations, Anderson, who by his own admission had no familiarity with European currency markets, invested another $22,000 in March and April 2004. Of the $27,000 Anderson invested through UIG, only $1,000 was ultimately returned to him. Notably, Levy never advised Anderson -- nor, apparently, any of the other customers – that 100% of Levy's clients realized a net loss upon closing their UFHC accounts.

Carrie Allsopp, the second victim, recounted a similar experience. She received a phone call in September 2003 from Duane Haughton, another AP at UIG, who suggested that she open an account with UFHC for the purpose of trading heating oil options. Haughton calculated that, in light of the upcoming winter season and the ongoing war in Iraq, Allsopp would earn precisely $4,020 per option for every penny increase in the price of a barrel of oil. Haughton also

assured her that he would employ a risk-free investment strategy. Based on this information, on January 29, 2004, Allsopp invested $10,000 in heating oil options through her UFHC account.

Later that day, Haughton told Allsopp that Levy, a senior, experienced officer at UIG who had done well by his clients in the past, was interested in speaking with her. When Levy came to the phone, he told Allsopp that the war in Iraq would cause the U.S. Dollar to depreciate significantly over the coming months. To capitalize on this trend, Levy recommended that Allsopp purchase Euro currency options as soon as possible. Levy also said that Allsopp could expect to receive $4,020 per option for every cent increase in the value of the Euro.

Allsopp explained to Levy that she had received $40,000 in a legal settlement resulting from her daughter's tragic death in a car accident, and that, under the terms of the settlement, she was holding the proceeds in trust for her two other daughters. Levy assured Allsopp that, as a result of his expert use of "stop loss" orders, the risks associated with Euro currency investments were minimal. Levy went so far as to guarantee that, if Allsopp invested the full $40,000, she would receive at least that amount in returns by the end of the week. All in all, Levy said he expected the net value of Allsopp's investment to reach $300,000.

Before concluding, Levy added that an investment in Euro options was the best way for Allsopp to ensure that her two living daughters would always remember the sacrifices of their deceased sister.

Based on Levy's recommendations, Allsopp invested $40,000 in Euro currency options through her UFHC account. Several weeks later, Levy informed Allsopp that she had a debit balance on her account, and told her that she should remit an additional $7,000. Of the approximately $57,000 Allsopp invested through her UFHC account, only $43 was returned to her. Allsopp, too, was never told that all of Levy's customers sustained a loss upon closing their UFHC accounts.

David Cuthbertson, victim three, testified that, in February 2004, he received a call from UIG AP Jerry Sipes, who suggested that Cuthbertson open an account with UFHC for the purpose of trading heating oil options. Sipes told Cuthbertson that, in light of political unrest in Nigeria and Venezuela, he could expect to double or triple his investment in two or three weeks, and added that UIG's strategy of hedging put and call options allowed its customers to profit irrespective of volatility in the futures markets. Based on this information, Cuthbertson invested $5,000 in heating oil options through a UFHC account.

Shortly thereafter, Sipes told Cuthbertson that he was close friends with a

11

UIG executive (Levy) who was an expert in Euro currency options. When Levy came to the phone, he described himself as a specialist in currency options trading, and, notably, added that his customers rarely lost any money because of his unique investment strategy, which involved purchasing both put and call options in an effort to hedge the Euro market. Levy also told Cuthbertson that his investment would triple in value within ten days. When Cuthbertson agreed to invest $5,000 in Euro futures options, Levy assured him that the investment would be worth as much as $21,000 within two weeks. Of the $13,650 Cuthbertson ultimately invested through his UFHC account, only $1,000 was returned to him.

Echoing these grim accounts of Levy's sales practices, Charles Jeffrey Thompson, the fourth victim, testified that, on March 10, 2004, he received a call from UIG AP Vince Monti, who suggested that Thompson could earn a significant profit by investing in unleaded gasoline options. Specifically, Monti said that Thompson could realize a return of ten times the value of his investment with "virtually no risk." Based on this information, Thompson made an initial investment of $5,000 through a UFHC account. One week later, Monti phoned Thompson and told him that "something really huge [was] going on in the market." Monti added that a senior official at UIG (Levy), who typically handled only large institutional clients, had agreed to speak briefly with Thompson. Later

12

that day, Levy contacted Thompson and described himself as a self-made millionaire. Levy echoed Monti's pitch that "something big" was happening in the Euro currency market. Levy asked Thompson whether he wanted to "be rich" and even said Thompson could earn "hundreds of thousands of dollars." Levy added that his research and market information allowed him to invest in the Euro currency market free of risk. Of the $57,750 Thompson invested with UFHC, he lost all but $23,000. Thompson, like the others, was never told that all of Levy's customers suffered a net loss after closing their UFHC accounts.

The CFTC's final victim witness, United States Army Sergeant Lanzy Williams, testified that, upon his return from a tour of duty in Iraq, he received a call from UIG AP Greg Atz, who suggested that Sergeant Williams invest in heating oil options as soon as possible. Atz said he could "almost guarantee[]" that Williams' investment would triple or quadruple in about thirty to forty days. Based upon this recommendation, Sergeant Williams invested $5,000 through an account he opened with UFHC. Some time later, Atz suggested that Williams speak with Levy, a man who, according to Atz, could make a lot of money in a very short period of time. Atz then passed the phone to Levy who said that Williams could quadruple his investment in thirty to sixty days by investing in European currency markets. Levy did not discuss any of the risks associated with currency options

13

trading, despite Williams' admonition that he was looking for stable investments. In fact, Sergeant Williams wrote on some paperwork reviewed by Levy that his goal for the account was "long-term financial stability." Because Sergeant Williams did not have additional cash on hand, Levy urged him to withdraw money from his 401(k) plan, which was "just sitting there and not doing anything," in order to fund an investment in Euro currency options. Based on Levy's misrepresentations, Sergeant Williams invested approximately $17,000 in Euro currency options through an account at UFHC. In total, Williams invested $22,000 with UFHC and lost all of it.

All told, the five testifying customers lost $146,350.88 as a result of their investments with UFHC, $116,350.88 of which are directly attributable to misrepresentations made by Levy. Levy admitted at trial that he used daily equity runs to determine the posture of each of his clients' investments, and the district court found that Levy knew precisely how much money each of his clients was losing. Despite this, Levy never once informed any of the five testifying customers that 100% of his clients realized a loss when they closed out their investments with UFHC.

The customers' testimony was corroborated by an audiotape recording of one of Levy's sales solicitations, which highlighted his propensity for improper,

14

high-pressure sales tactics. On the tape, Levy can be heard telling "Jerry," an undercover informant, that he would make a great deal of money by investing in oil futures. Levy added that his "perfect" strategy of purchasing both put and call options ensured that Jerry would profit irrespective of volatility in the futures markets. Levy described his investment techniques as "conservative" and suggested that Jerry would thank him in the long run. When Jerry resisted, Levy asked whether Shapiro (the UIG AP who had initiated Jerry's solicitation) had advised Jerry against wasting Levy's time. In response, Jerry acknowledged that he knew Levy's time was valuable and committed himself to a sizeable investment.

The district court was also persuaded by the admission into evidence of a sales manual entitled "Sales Success: The Complete Guide to Selling Investments Around the World," which was found in Levy's UIG office. The manual includes numerous scripts for sales solicitations, including several that are remarkably similar to the techniques described by the testifying customers at trial. Thus, for example, a salesman in the manual recites the following pitch: "[M]y company has targeted an investment that we believe could double or triple your money in the next 30 to 60 days." A second document found in Levy's desk, entitled "Working with Other Brokers," features the following pitch: "Listen, the president of the

15

company is taking everyone off the phones in a few minutes. The top broker here is giving an emergency meeting on the markets. This doesn't happen often but when it does it's usually something big." The script continues along these lines, instructing the first broker to call the customer and inform him that a second, more senior broker is prepared to speak with him as a favor, despite the senior broker's usual practice of dealing only with institutional clients.

After finding this evidence credible, the district court concluded that Levy had "made misrepresentations, misleading statements, and deceptive omissions regarding [the] profit potential and risks of trading options"; that he had "acted with scienter"; and that his "misrepresentations and omissions were material." United Investors Group, Inc., No. 05-80002, at 22, 24, and 25. Indeed, the district court characterized Levy's conduct as "brazen and intentional." Id. at 31. The trial court then determined that Levy had committed five violations of the CEA with respect to each of the five testifying customers, for a total of twenty-five violations. Id. at 30. The court observed that "Section 6c of the [CEA], together with CFTC Regulation 143.8[(a)](2)(ii), 17 C.F.R. § 143.8[(a)](2)(ii), permits imposition of a civil monetary penalty . . . of up to the greater of $120,000 per violation or triple the monetary gain to the violator." Id. at 29. However, instead of "unbundl[ing]" the violations, the district court treated Levy's dealings with each

16

customer as a single violation and imposed a civil monetary penalty of $600,000. Id. at 31-32.[7]

In addition, the court ordered Levy to pay a restitution award in the amount of $146,350.88 as "ancillary equitable relief" to compensate each of the five testifying customers for the monies they lost "as a consequence of Levy's misconduct." Id. at 27-28. Finally, after finding a "clear nexus" between Levy's bank accounts and his "fraudulent trading activity," the district court "continue[d] the asset freeze" it had imposed at the beginning of the litigation pending complete satisfaction of its judgment.[8] Id. at 26-27. This timely appeal followed.

## II.

We review for clear error findings of fact made by the district judge after a bench trial, Morrissette-Brown v. Mobile Infirmary Med. Ctr., 506 F.3d 1317, 1319 (11th Cir. 2007), and we review de novo questions of law, including statutory interpretation. United States v. Maupin, 520 F.3d 1304, 1306 (11th Cir.

---

[7] The district court specifically refused to impose a civil monetary penalty based on the total number of violations committed by Levy against all of his customers, which would have included both customers who testified at trial and those who did not.

[8] On February 25, 2005, a magistrate judge recommended that, in light of the amount of money at stake and Levy's record of nefarious business practices, an asset freeze was necessary to prevent the pre-judgment dissipation of funds. The district court adopted this Report and Recommendation on June 9, 2005.

2008) (per curiam) (citing United States v. Johnson, 399 F.3d 1297, 1298 (11th Cir. 2005)). Civil penalty assessments are reviewed only for abuse of discretion. United States v. Nat'l Fin. Servs., Inc., 98 F.3d 131, 140 (4th Cir. 1996); United States v. Reader's Digest Ass'n, 662 F.2d 955, 967 (3d Cir. 1981).

Moreover, "[w]e will not disturb the district court's choice of an equitable remedy except for abuse of discretion." CFTC v. Sidoti, 178 F.3d 1132, 1137 (11th Cir. 1999). But, to the extent the district court's selection of an equitable remedy involves an element of statutory interpretation, its conclusions are reviewed de novo. See Pedraza v. United Guar. Corp., 313 F.3d 1323, 1328 (11th Cir. 2002) ("The exercise of the court's inherent powers is reviewed for abuse of discretion. However, a determination as to the scope of those powers is a legal conclusion, and as such is reviewed de novo.") (citation omitted). Finally, "[w]e review asset freezes for abuse of discretion but do not defer to the district court's legal analysis." Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 986-87 (11th Cir. 1995).

## A.

First, Levy argues that the district court erred in multiplying the maximum civil monetary penalty for which he is liable by the number of "violations" proved at trial, rather than by the number of "counts" alleged in the CFTC's complaint. In

18

other words, Levy says that the CFTC's complaint, which contained only a single count of solicitation fraud, can yield only one "violation" of the CEA. We are unpersuaded.

To begin with, the Commodity Exchange Act empowers district courts to punish "any violation" of its provisions. It says: "In any action brought under this section, the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation a civil penalty . . . ." 7 U.S.C. § 13a-1(d)(1) (emphasis added). Thus, contrary to Levy's suggestion, the CEA does not say, expressly or otherwise, that each allegation in the CFTC's complaint must be separated into distinct counts.

Moreover, the CFTC's enforcement regulations, found in 17 C.F.R. § 143.8(a)(2), proscribe only "violations" of the CEA -- again, without requiring that each allegation be separated into different counts. In pertinent part, the regulations state: "[F]or each violation [of the CEA]," the district court may impose a civil monetary penalty of "not more than the greater of $120,000 or triple the monetary gain to such person for each such violation[.]" 17 C.F.R. § 143.8(a)(2)(ii) (emphasis added).

The CFTC's complaint alleged plainly and unambiguously that it was charging Levy with multiple violations of the Commodity Exchange Act. Indeed,

the complaint explicitly said: "Each material representation and omission of UIG and its APs, including, but not limited to, those specifically alleged herein, is a separate and distinct violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Section 33.10(a) and (c) of the Regulations . . . ." (emphasis added). That the CFTC elected to include multiple violations of the CEA and the regulations promulgated thereunder in a single count in no way limits the charge to the commission of only one violation. It is undeniable that the complaint fairly informed Levy that he was being charged with each material misrepresentation and omission as a separate and distinct violation of the CEA and its implementing regulations.

Levy insists, however, that Slusser v. CFTC, 210 F.3d 783 (7th Cir. 2000), supports his position. We disagree. In that case, Slusser and the entities he controlled raised $29 million by making fraudulent misrepresentations to a pool of German investors. Id. at 783-84. The CFTC's complaint charged Slusser with six counts of fraud, failure to abide by contractual limitations, and failure to register as a "commodity pool operator." Id. at 784. After trial, the CFTC banned Slusser from U.S. futures markets and fined him $10 million. Id. A panel of the Seventh Circuit vacated and remanded, observing that the CFTC's complaint listed six counts and charged only one violation per count. Id. at 786. The court held that

"[j]ust as the sentence in a criminal case is limited by the number of counts alleged in an indictment . . . so the penalty in an administrative prosecution is limited by the number of violations alleged in the complaint times the maximum fine per violation." Id. (emphasis added). In the absence of some charging language indicating that each count in fact represented multiple violations, "[a] reasonable person in Slusser's position would have assumed that his maximum exposure was $600,000 and financed his defense accordingly." Id. The court's concern was that the CFTC had not fairly and adequately notified Slusser as to the precise amount of his exposure.

Here, by contrast, the CFTC did not charge Levy with only one violation, but rather made explicit on the face of its complaint that "[e]ach material representation and omission of UIG and its APs, including . . . those specifically alleged [in the complaint], is a separate and distinct violation of" the CEA. Thus, after finding that Levy had committed at least five violations of the Commodity and Exchange Act, the district court properly multiplied the maximum civil monetary penalty of $120,000 by five.[9] Slusser suggests nothing more.

---

9        As noted, the district court actually found that Levy had committed twenty-five violations of the CEA -- five with respect to each testifying customer. However, exercising its discretion, the court elected to treat all of Levy's violations with respect to each customer as a single violation, thereby decreasing the number of violations by a multiple of five. The CFTC has not cross-appealed this ruling.

21

B.

Levy also says that, even if the $600,000 civil monetary penalty is permissible under the Commodity Exchange Act, the district court abused its discretion anyway, because the aggregate penalty is excessive. Levy observes that the five testifying customers lost a total of $146,350.88, of which he himself earned only $19,520. Levy argues that, like his settling co-defendants, he should have been penalized only to the extent of his profits. Again, we disagree.

The express language of the CEA's enforcement regulations permits a district court to assess a civil monetary penalty of $120,000 for "each violation" of the statute. 17 C.F.R. § 143.8(a)(2). We have not had occasion to determine when, or how, a district court may abuse its discretion in imposing a penalty that, although theoretically permissible under the statute, may be excessive under the circumstances. Two of our sister circuits, however, require only that a civil monetary penalty be rationally related to the offense charged or the need for deterrence. R&W Technical Servs. Ltd. v. CFTC, 205 F.3d 165, 177 (5th Cir. 2000) ("Sanctions are reviewed under the abuse of discretion standard. The standard is that the sanction must be rationally related to the offense.") (footnote omitted); Monieson v. CFTC, 996 F.2d 852, 862 (7th Cir. 1993) ("[S]anctions may be modified or reversed where the remedy selected has no reasonable relation to

22

the practice found to exist.") (quotation marks omitted). In justifying this permissive standard, the Seventh Circuit has said:

> [I]f the order of an administrative agency finding a violation of a statutory provision is valid and the penalty fixed for the violation is within the limits of the statute the agency has made an allowable judgment in its choice of remedy and ordinarily the Court of Appeals has no right to change the penalty because the agency might have imposed a different penalty.

Monieson, 996 F.2d at 862 (quoting G.H. Miller & Co. v. United States, 260 F.2d 286, 296 (7th Cir. 1958) (en banc)).

Levy concedes that a rationally related standard should likewise apply to civil penalties imposed by district courts, and we can se no valid reason to hold otherwise. Accordingly, we agree with our sister circuits that a rationally related standard adequately accounts for the broad discretion district courts typically exercise in calculating a civil monetary penalty.

Here, the district court found that "Levy made misrepresentations and misleading statements that . . . exaggerated profit potential and downplayed risk," and that he "repeatedly promised customers that they would at least double or triple their investments in less than a few months, even though historically 100 percent of [his] customers lost some or all of the money they used to purchase options through him." United Investors Group, Inc., No. 05-8002, at 22.

Specifically, the court pointed out that Levy is a recidivist who was not deterred by his prior settlements with the CFTC; Levy was unapologetic at trial, as, for example, when he claimed that each of the testifying customers was "absolutely lying"; Levy's own testimony was mendacious and incredible, and his portrayal of the events in question smacked of a "selective memory"; Levy was an integral player in UIG's sales solicitation scheme; Levy preyed on unsophisticated investors and profited from his fraudulent solicitations; Levy acted intentionally; and the five testifying customers who interacted with Levy lost more than $100,000 as a result of his repeated misrepresentations.

The record strongly supports the district court's conclusion that a civil monetary penalty in the amount of $600,000 is rationally related and proportionate to Levy's multiple offenses and the undeniable need to deter him from committing similar violations in the future. Levy's suggestion that he, like his co-workers, should have been penalized only to the extent of his profits utterly fails to account for the brazen, repeated, and intentional nature of his violations. Accordingly, we have little difficulty concluding that the district court did not abuse its discretion in imposing a $600,000 civil monetary penalty under the statute.

C.

The district court also ordered Levy to pay $146,350.88 in restitution "as

ancillary equitable relief" to compensate the five testifying customers (Anderson, Allsopp, Cuthbertson, Thompson, and Williams) for their losses. Levy contends that the district court, sitting in equity, was without power to impose restitution as a means of compensating victims for their losses, because "restitution as compensation" is essentially a legal remedy beyond the scope of an equity court's jurisdiction. At most, Levy says, the district court could have ordered him to disgorge the $19,520 he earned as a result of his fraudulent solicitations -- that is, entered an order for restitution in equity.

Resolution of this issue is foreclosed by our recent decision in CFTC v. Wilshire Investment Management Corp., 531 F.3d 1339 (11th Cir. June 26, 2008). In Wilshire, we acknowledged that "a court's jurisdiction under § 13a-1 includes equitable remedies . . . ." Id. at 1344. More specifically, we said that "the unqualified grant of statutory authority to issue an injunction under § 13a-1 carries with it the full range of equitable remedies, among which is the power to grant restitution." Id. At the same time, we held that "[t]he equitable remedy of restitution does not take into consideration the plaintiff's losses, but only focuses on the defendant's unjust enrichment." Id. at 1345. In light of Wilshire, we are required to conclude that Levy can only be liable in restitution to the extent of his

unjust enrichment.[10] Accordingly, we vacate the district court's restitution order of $146,350.88, and remand for further proceedings to determine what if any disgorgement amount should be imposed.

D.

Finally, Levy raises two challenges to the scope of the district court's asset freeze. First, he argues that the district court erred in freezing <u>all</u> of his assets because only his Wachovia account, No. 9985017012, contains the commissions he earned for the investments he solicited from the five testifying customers. However, until the district court has had an opportunity to quantify Levy's ill-gotten gains, <u>see</u> Section II.C., <u>supra</u>, it would be premature for us to rule on the scope of the asset freeze.

It is undisputed that the Commodity Exchange Act drapes the district court with broad equitable power. In pertinent part, the statute provides:

> Whenever it shall appear to the Commission that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, . . . the Commission may bring an action in the proper district court of the United States . . . to enjoin such act or practice, or to enforce compliance with this

---

[10] Of course, because none of the amounts invested by the five testifying customers can be incorporated into the restitution award, we express no opinion as to whether the district court erred by including in its restitution order a subset of those investments -- specifically, the $30,000 invested by these customers prior to their interactions with Levy.

26

chapter, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions . . . .

7 U.S.C. § 13a-1(a). Interpreting a similarly broad provision of the Emergency Price Control Act[11] many years ago, the Supreme Court held that, "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." Porter, 328 U.S. at 398. Put simply, "where . . . the equitable jurisdiction of the court has properly been invoked for injunctive purposes, the court has the power to decide all relevant matters in dispute and to award complete relief . . . ." Id. at 399. Moreover, where, as here, the public interest is involved, a district court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." Id. at 398; see also AT&T Broadband v. Tech Commc'ns, Inc., 381 F.3d 1309, 1316 (11th Cir. 2004).

---

[11] In pertinent part, Section 205(a) of the Emergency Price Control Act of 1942 provided as follows:

> Whenever in the judgment of the Administrator any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act, he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond.

Pub. L. No. 77-26, § 205(a), 56 Stat. 23, 33 (1942) (repealed 1947).

27

It is unsurprising, therefore, that a district court may freeze a defendant's assets to ensure the adequacy of a disgorgement remedy. See, e.g., SEC v. ETS Payphones, Inc., 408 F.3d 727, 734 (11th Cir. 2005) ("[T]he asset freeze is justified as a means of preserving funds for the equitable remedy of disgorgment."); CFTC v. Muller, 570 F.2d 1296, 1301 (5th Cir. 1978) ("This temporary freeze of defendant's assets was reasonably necessary to assure that the court's jurisdiction would not be defeated by the defendant's disposition of assets in the event the court should ultimately order disgorgement of the allegedly misappropriated funds."). At this point, we cannot be sure whether the district court will order a disgorgement remedy -- and, if it does, in what amount. Accordingly, we decline to set aside the asset freeze at this time. See CFTC v. Amer. Metals Exch. Corp., 991 F.2d 71, 79 (3d Cir. 1993) ("Because a freeze is designed to preserve the status quo by preventing the dissipation and diversion of assets, we will allow the freeze to remain in effect until the district court determines whether it can make an informed determination of the amount of unlawful proceeds retained by Maxwell, and, if it can, what that amount may approximate.") (citation omitted).

Levy also argues that the district court lacked authority to place a freeze on his assets pending satisfaction of the civil monetary penalties assessed against

28

him. In effect, Levy says that a district court can only freeze a defendant's assets to ensure the sufficiency of an equitable remedy. Because the civil monetary penalties imposed in this case are legal in nature, Levy contends that they cannot form the basis for an asset freeze. For its part, the CFTC never urged the district court to freeze Levy's assets in order to secure satisfaction of any civil monetary penalties the court might impose. Rather, it argued that "[s]ufficient legal and evidentiary bases exist for continuing the asset freeze in this case pending satisfaction of any equitable restitution award rendered in this case." Plaintiff's Proposed Findings of Fact and Conclusions of Law, at 24 (emphasis added). Now, the CFTC says the matter is not yet ripe for adjudication. It suggests: "Whether the freeze could properly be maintained were the restitution awards paid, but not the civil monetary penalty, is a premature, speculative issue that is not before this court." Brief of Appellee at 35. We agree that the question is not ripe and decline to address the issue until the district court has determined, first, what, if any, disgorgement remedy it may impose (and in what amount) and, second, how much Levy's frozen assets may be worth.

III.

Accordingly, we affirm the district court's judgment in all respects, except insofar as the court ordered Levy to pay restitution in the amount of $146,350.88.

29

As for this issue, we vacate the district court's order and remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED IN PART.**