[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 29, 2012
JOHN LEY
CLERK

_____

No. 11-12059

_____

D.C. Docket No. 6:08-cv-00829-MSS-KRS

SECURITIES & EXCHANGE COMMISSION,

Plaintiff-Appellee,

versus

RICHARD L. GOBLE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 29, 2012)

Before MARCUS, COX and SILER[*], Circuit Judges.

COX, Circuit Judge:

The Securities and Exchange Commission ("SEC") brought this civil

enforcement action against Richard L. Goble after he orchestrated a plan to

_____

[*]Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

manipulate the amount of money his company was required to set aside to safeguard customer assets. The district court conducted a five-day bench trial to consider the SEC's claims. The court found Goble liable for committing securities fraud in violation of § 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The court also found that Goble aided and abetted violations of the Customer Protection Rule, 15 U.S.C. § 78o(c)(3); 17 C.F.R. § 240.15c3-3, and the books and records requirements of the Exchange Act, 15 U.S.C. § 78q(a); 17 C.F.R. § 240.17a-3. According to the court, Goble directed one of his employees to record a fake purchase of a money market fund in his company's books. And each of Goble's violations arose out of this single sham transaction. The court enjoined Goble from future violations of the securities laws and permanently restrained him from seeking a securities license or engaging in the securities business.

On appeal, Goble challenges the district court's holding on liability and the propriety of the resulting injunction. He argues that the district court erred by concluding that he committed § 10(b) securities fraud. If we reverse this securities fraud count, Goble believes his aiding and abetting violations must be reversed as well. After reviewing the record and having the benefit of oral argument, we agree with Goble that the facts as found by the district court do not support securities fraud

2

liability and we reverse the court's judgment on this claim. However, it is also clear from the district court's factual findings that Goble aided and abetted violations of the Exchange Act, so we affirm the judgment finding liability on these counts. Since we reverse the court's finding of securities fraud, we vacate the portion of the injunction restraining Goble from violating § 10(b) of the Exchange Act and Rule 10b-5. We also vacate the injunction barring Goble from the securities business for life. Goble contends that the remaining portions of the injunction are impermissible "obey-the-law" commands. We agree in part and vacate these paragraphs of the injunction for the reasons hereinafter set forth.

## I. BACKGROUND

Goble founded North American Clearing, Inc. ("North American"), a securities and clearing brokerage firm, in 1995. While he had no officially designated regulatory or supervisory responsibilities at North American, he sat on the corporation's board of directors, actively participated in North American's day-to-day operations, and in effect controlled a 100% interest in the company. Clearing firms like North American process trades for smaller and less capitalized brokers and dealers. At the time the SEC filed its complaint, North American acted as the clearing firm for about forty small brokerage firms and cleared transactions for more than 10,000 customer accounts valued at more than $500 million.

A variety of SEC regulations governed North American's operations. Central to this case is the Customer Protection Rule. This Rule is designed to protect broker-dealer customers in the event the brokerage firm becomes insolvent. It requires that brokerage firms establish a separate Reserve Bank Account ("Reserve Account") to hold an amount of cash adequate to reimburse customers if the firm fails. 17 C.F.R. § 240.15c3-3(e)(1). The Rule also dictates that firms use the regulation's Reserve Formula to calculate the balance they must maintain in the Reserve Account. *Id.*

The specifics of the Reserve Formula are fairly arcane, but its operation is straightforward. On a weekly basis, firms must balance customer credits against customer debits. 17 C.F.R. § 240.15c3-3(e)(3). Subject to some adjustments, the Rule requires that firms hold an amount equal to the excess of credits over debits in the Reserve Account. 17 C.F.R. § 240.15c3-3a. As defined by the regulations, "customer credits" captures the amount the firm owes its customers while "customer debits" refers to amounts the customers owe the firm. If, after the firm makes the reserve computation, it discovers that the Reserve Account balance is higher than the amount required by the Reserve Formula, the firm may make a withdrawal from the Reserve Account. 17 C.F.R. § 240.15c3-3(g).

During late 2007 and early 2008, North American faced declining revenues, and it struggled to meet its operating expenses and make the required contributions to the Reserve Account. To make up for the shortfall, North American drew on an existing loan secured by customer securities. Because customer securities collateralized the loan, however, the Reserve Formula dictated that North American deposit more money into the Reserve Account when it increased the loan balance. Thus, drawing on the loan only exacerbated North American's cash flow problem.

In March of 2008, the Financial Industry Regulatory Authority, Inc. ("FINRA") began an on-site audit of North American and remained there as the events precipitating this case transpired. During the audit, FINRA examiners uncovered irregularities in North American's reserve computations. Timothy Ward,[1] North American's Chief Financial Officer who had responsibility for North American's financial reporting and preparing the weekly reserve computation, characterized these irregularities as the result of his own mistakes and miscalculations. The examiners helped Ward correct these mistakes, and they remained on-site conducting regular reviews of North American's books and records.

---

[1] The SEC's complaint charged Ward and Goble as codefendants. Prior to trial, however, Ward settled with the SEC. He testified as a witness for the SEC at Goble's trial.

By May of 2008, the cash flow problem at North American was severe. On May 13, Goble sought a $5 million unsecured loan to rectify the firm's negative financial spiral. When Goble was unable to procure the loan, he directed Ward to record a $5 million money market purchase in North American's books. But no such purchase had been made. The purpose of this sham transaction was to make it appear on paper that North American could withdraw money from the Reserve Account. Had there been a real purchase of money market funds, it would have decreased the amount of the required balance in the Reserve Account. The day after Ward recorded the sham purchase he made an interim reserve calculation using the faulty numbers created by the sham transaction. This computation showed that North American could withdraw $3.4 million from the Reserve Account. Bruce Blatman[2] (North American's President and CEO) and Goble signed a wire request to move $3.4 million from the Reserve Account into North American's settlement account. After the funds transferred, the FINRA examiners quickly discovered a discrepancy created by the sham money market purchase and demanded an explanation.

As a result, Ward and Blatman discussed the May 13th sham transaction with the examiners. At the insistence of the examiners, Ward returned the $3.4 million to

---

[2] Like Ward, Blatman was also named as a codefendant. He too settled with the SEC and testified for the SEC at Goble's trial.

the Reserve Account and prepared a revised reserve computation. The revised computation showed that North American needed to deposit an additional $1.8 million into the Reserve Account. In the following days, it became clear that North American could not meet the reserve requirement, and Ward and Blatman decided to wind down North American's affairs after consultation with FINRA and the SEC.

A few days later, the SEC filed its complaint in this case against North American, Bruce Blatman, Timothy Ward, and Richard Goble for violations of the securities regulations. The complaint alleged that North American violated the Customer Protection Rule at § 15(c)(3) of the Exchange Act and Rule 15c3-3 thereunder, and that North American violated the Exchange Act's books and records requirements at § 17(a) and Rule 17a-3 thereunder. It maintained that Goble, Blatman, and Ward aided and abetted these violations. The complaint also alleged that each of the defendants violated the anti-fraud provision at § 10(b) of the Exchange Act and Rule 10b-5 thereunder.

The SEC settled with North American, Blatman, and Ward, but the district court held a five-day bench trial on the claims against Goble. The court concluded that Goble aided and abetted North American's Customer Protection Rule and books and records violations. It also held that Goble's actions concerning the sham money market transaction violated § 10(b) of the Exchange Act and Rule 10b-5. The court

7

permanently enjoined Goble from obtaining a securities license or engaging in the securities business. The injunction also permanently restrained Goble from violating the Customer Protection Rule, the books and records requirements, § 10(b), and Rule 10b-5. Goble appeals, challenging the court's decision on liability and the injunction.

## II. ISSUES ON APPEAL

Goble raises the following five issues: (1) whether recording the fake money market purchase in North American's internal books violates § 10(b) and Rule 10b-5; (2) whether he can be liable for aiding and abetting North American's violations of the Customer Protection Rule and the Exchange Act's books and records requirements if there is no underlying securities fraud; (3) whether the district court abused its discretion by permanently enjoining him from engaging in the securities business when the SEC did not seek this relief in its complaint; (4) whether the portions of the injunction restraining him from violating the securities laws are unenforceable "obey-the-law" commands; and (5) whether the district court should have drawn an adverse inference against the SEC because of the spoliation of evidence.

## III. DISCUSSION

A. Section 10(b) Securities Fraud

The district court decided that Goble used the sham money market transaction to conceal North American's true financial condition and thereby violated § 10(b) and Rule 10b-5.[3] This determination is a conclusion of law, which we review de novo.[4] *See Commodity Futures Trading Comm'n v. Levy*, 541 F.3d 1102, 1110 (11th Cir. 2008). "To prove a [§] 10(b) violation, the SEC must show (1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (citing *Aaron v. SEC*, 446 U.S. 680, 695, 100 S. Ct. 1945, 1955 (1980)). Because this is a civil enforcement action brought by the SEC, reliance, damages, and loss causation are not required elements. *See SEC v. Morgan Keegan & Co.*, --- F.3d --- , --- , No. 11-13992, 2012 WL 1520895, at *9 (11th Cir. May 2, 2012) (noting that "justifiable reliance" is not an element of an SEC enforcement action); *see also FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1295 (11th Cir. 2011) (listing reliance, damages, and loss causation as

---

[3] Section 10(b) of the Exchange Act is codified at 15 U.S.C. § 78j(b). Rule 10b-5, promulgated pursuant to this statutory provision, is codified at 17 C.F.R. § 240.10b-5. The scope of liability under the two provisions is the same. *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 n.17 (11th Cir. 2007) (citing *SEC v. Zandford*, 535 U.S. 813, 816 n.1, 122 S. Ct. 1899, 1901 n.1 (2002)). We will use § 10(b) to refer to both the statutory provision and the rule.

[4] At trial, the SEC also argued that Goble violated § 10(b) by improperly sweeping money market funds out of customer accounts. The district court decided that the SEC failed to prove this allegation by a preponderance of the evidence. Before this court, the SEC has only argued that Goble violated § 10(b) when he directed Ward to record the fake money market fund purchase in North American's books. Thus, we consider only whether this conduct violated § 10(b).

additional elements required for a § 10(b) claim by a private plaintiff (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008))). Goble does not dispute that he had the requisite scienter to commit securities fraud. Instead, he maintains that he never made a material misrepresentation or omission in connection with the purchase or sale of a security.

1. A "Material Misrepresentation"

According to the district court, the May 13th sham money market transaction had the effect of misrepresenting North American's true financial condition. It gave "the appearance that the firm was either financially solvent when it was not or even more solvent than it was." (R.8-260 at 18.) The court found that reasonable investors would want to know the truth about their broker-dealer's financial condition so the misrepresentation was material.

Goble claims that the district court's reasoning misapplies the law on material misrepresentations. He first notes that a violation of the securities regulations standing alone cannot form the basis for § 10(b) securities fraud. Then, he maintains that a material misrepresentation must be disclosed to customers or the public. Because the May 13th sham money market transaction was only an internal record, he argues that he never made a public misrepresentation. The SEC responds that a public misrepresentation was not necessary in this case because reliance by customers

10

or the public is not an element of § 10(b) securities fraud in a civil enforcement action. It also notes § 10(b) prohibits fraudulent schemes and that the sham transaction was part of a scheme to defraud FINRA. Finally, the SEC contends that the false transaction would have been material to investors using North American as their clearing firm. In other words, the SEC argues that had investors known about the misrepresentation they may have chosen a different broker-dealer to process their transactions.

First, we can easily dispatch the district court's and SEC's theory that the sham transaction would have been material to an investor's choice of broker-dealers. This court has said that "[t]he test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.'" *Merch. Capital, LLC*, 483 F.3d at 766 (quoting *SEC v. Carriba Air*, 681 F.2d 1318, 1323 (11th Cir. 1982)). We understand this "course of action" to mean an investment decision—not an individual's choice of broker-dealers.[5] *See id.* at 766-72 (determining whether misrepresentations or

---

[5] We recognize that in *SEC v. Morgan Keegan & Co.* we stated that a statement is material "if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Morgan Keegan & Co.*, --- F.3d at ---, 2012 WL 1520895, at *10 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132 (1976)). We also explained that "[t]he role of the materiality inquiry is 'to filter out essentially *useless information that a reasonable investor would not consider significant*, even as part of a larger "mix" of factors to consider in making his investment decision.'" *Id.* at ---, at *11 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224,

11

omissions would affect decision to purchase interest in limited liability partnerships); *see also SEC v. Pirate Investor LLC*, 580 F.3d 233, 240 (4th Cir. 2009) ("[A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security . . . ." (alteration in original) (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999))); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) ("A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock." (citations omitted)). We decline the SEC's invitation to expand our definition of materiality to capture Goble's misrepresentation. We hold that a misrepresentation that would only influence an individual's choice of broker-dealers cannot form the basis for § 10(b) securities fraud liability.

The SEC also highlights that under § 10(b) fraudulent schemes or deceptive devices may form the basis for liability. *See* 17 C.F.R. § 240.10b-5(a), (c).[6] The

_____

234, 108 S. Ct. 978, 985 (1988)). Thus, the relevant "mix" of information is those facts an investor would consider when making an investment decision. The "total mix" test for materiality is not concerned with whether the misrepresentation would alter the mix of information available as the investor chooses a broker-dealer. *Cf. Basic Inc.*, 485 U.S. at 236, 108 S. Ct. at 986 (considering materiality of information to the "trading decision of a reasonable investor").

[6] Rule 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,

12

SEC's portrayal of Goble's fraudulent scheme has changed throughout this litigation. In its brief to this court, the SEC writes that Goble engaged in a scheme to defraud FINRA. Before the district court, the SEC suggested that the sham money market transaction was part of a scheme to manipulate the Reserve Account and the reserve computation. (R.14-254 at 126-27.) In essence, the SEC argues that Goble's intentional effort to evade the securities regulations was a fraudulent scheme. However, when the SEC asserts that this scheme was material, it relies on the fact that an investor would want to know that his or her broker-dealer made improper transfers from the Reserve Account. As we just explained, this does not meet our test for materiality. While this information might affect a reasonable investor's choice of broker-dealers, it would not affect the underlying investment decision.

2. "In Connection with the Purchase or Sale of Securities"

Even if we assume that Goble made a material misrepresentation or omission, the misrepresentation was not made "in connection with the purchase or sale of securities." The district court found that the May 13th sham money market

---

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5.

transaction was not a misrepresentation in connection with the purchase or sale of a *particular* security. This followed from the court's decision that the money market fund account at issue did not meet the definition of a security under the Exchange Act.

Despite finding that the money market fund account was not a security, the district court concluded that Goble's sham transaction satisfied the "in connection with" element based on a "fraud-on-the-market" theory. It held that Goble's deception amounted to a fraud on the market because a reasonable investor would have been interested in North American's financial troubles. Goble contends that the district court misapplied the fraud-on-the-market doctrine. We agree. In the context of a § 10(b) private cause of action, reliance by the plaintiff is an essential element of the claim. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159, 128 S. Ct. 761, 769 (2008). The fraud-on-the-market doctrine creates a rebuttable presumption of reliance when a defendant makes misrepresentations publicly. *Id.* Thus, the fraud-on-the-market doctrine, at least insofar as that doctrine is traditionally understood, has no application to this case because this is a civil enforcement action brought by the SEC, not a private cause of action. The SEC had to demonstrate a connection between Goble's misrepresentation and the purchase or sale of securities, not investor reliance. *See Morgan Keegan & Co.*, --- F.3d at ---,

14

2012 WL 1520895, at *9 (explaining that investor reliance is not an element of an SEC enforcement action for violations of § 10(b)). Therefore, the fraud-on-the-market theory does not apply in this case.[7]

The SEC maintains that it was unnecessary for the district court to engage in its fraud-on-the-market analysis. It asserts that "[t]he simplest reason why Goble's fraud was in connection with the purchase or sale of securities is that the essential first step in the scheme was recording fake purchases of $5 million worth of shares of a money market mutual fund, which is a type of security." (Appellee's Br. at 38-39.) We assume (without deciding) that the SEC has correctly identified the money market fund as a security and that the district court erred in this regard. Nevertheless, we hold that Goble's misrepresentation was not made in connection with the "purchase or sale" of securities.

The only "purchase" involved in the May 13th transaction was Goble's directing Ward to record a fake purchase in North American's books. We must decide whether "purchase or sale" as used in § 10(b) captures this sham transaction. We note at the outset that the Supreme Court has instructed that § 10(b) and its "in

---

[7] The SEC understands the district court's use of the phrase "fraud on the market" to mean that a misrepresentation may satisfy the "in connection with" requirement if it would influence an investor's decision to buy or sell securities. Even under this theory, however, Goble's misrepresentation does not satisfy the "in connection with" requirement because the misrepresentation would not affect an investment decision.

15

connection with" requirement be construed "flexibly to effectuate its remedial purposes." *SEC v. Zandford*, 535 U.S. 813, 819, 122 S. Ct. 1899, 1903 (2002) (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S. Ct. 1456, 1471 (1972)) (internal quotation marks omitted). Therefore, the term "purchase" as used in § 10(b) is not limited to "traditional face-to-face commercial transactions." *Coffee v. Permian Corp.*, 434 F.2d 383, 385 (5th Cir. 1970) (quoting *Fidelis Corp. v. Litton Indus., Inc.*, 293 F. Supp. 164, 169-70 (S.D.N.Y. 1968)).[8] We must decide the meaning of "purchase" in the context of § 10(b) and should ask whether the "alleged conduct is the type of fraudulent behavior which was meant to be forbidden by the statute and the rule." *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 466-67, 89 S. Ct. 564, 572 (1969). In some instances a § 10(b) fraud may occur even without an actual purchase or sale of securities. *See Grippo v. Perazzo*, 357 F.3d 1218, 1223-24 (11th Cir. 2004).

First, Goble did not engage in a "purchase" as we understood that term in *Grippo*. There, we decided that a broker who accepts payment for securities he never intends to deliver satisfies the "in connection with the purchase or sale of securities" requirement. *Id.* So, we also said that a plaintiff can adequately plead § 10(b) fraud

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

without identifying the purchase of any particular security. *Id.* But, the SEC does not argue that Goble engaged in the type of conduct at issue in *Grippo*. He never accepted payment for a money market fund and then failed to deliver the security to a customer.

Nor is the May 13th sham transaction the type of behavior meant to be forbidden by § 10(b). The SEC has labeled Goble's plan to make an improper withdrawal from the Reserve Account as § 10(b) fraud. But, the securities regulations directly implicated by this conduct are the Customer Protection Rule and books and records requirements of the Exchange Act, not § 10(b). Section 10(b) was not intended to protect investors from a broker-dealer's inaccurate records or an inadequate reserve fund. Because Goble's behavior was not the type of conduct meant to be forbidden by § 10(b), this weighs against finding that Goble's fake transaction was a "purchase" under § 10(b).

Furthermore, the alleged "purchase" did not involve a change of ownership, an exchange of value, or a promise to purchase a security. And, recording a fake transaction in North American's books had no effect on the broader securities market and would not impact an investor's decision to purchase a security. In light of all this, we do not consider the May 13th sham transaction to be a purchase within the meaning of § 10(b). Therefore, we hold that Goble's misrepresentation was not made

17

in connection with the purchase or sale of securities. Accordingly, the district court's judgment on the securities fraud claim must be reversed both because Goble's misrepresentation was not material and because it was not made in connection with the purchase or sale of securities.

B. Aiding and Abetting Violations

The court also found Goble liable for aiding and abetting North American's violations of the Customer Protection Rule and the Exchange Act's books and records requirements. The Customer Protection Rule directs that a specific balance be maintained in a segregated account. There is no question North American failed to maintain the balance required by the Rule. The books and records requirements at § 17(a) of the Exchange Act, 15 U.S.C. § 78q(a), and Rule 17a-3, 17 C.F.R. § 240.17a-3 thereunder, required North American to maintain accurate records. Goble does not dispute that North American failed to comply with these regulations. Instead, he claims that no primary securities fraud violation supports his aiding and abetting liability. But this argument misses the mark.

Exchange Act § 20(e), 15 U.S.C. § 78t(e), allows the imposition of aiding and abetting liability against "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of [the Exchange Act], or of any rule or regulation issued" thereunder. 15 U.S.C. § 78t(e). Thus, to

18

impose aiding and abetting liability under § 20(e) there must be: (1) a primary violation of the securities laws; (2) the aider and abettor must have knowledge of the primary violation; and (3) the aider and abettor must provide substantial assistance in the commission of the primary violation. *See VanCook v. SEC*, 653 F.3d 130, 142 (2d Cir. 2011); *SEC v. Shanahan*, 646 F.3d 536, 547 (8th Cir. 2011). A primary securities fraud violation is not an element of an aiding and abetting claim.

There is no question that primary violations of the Customer Protection Rule and the books and records requirements occurred at North American. And, the testimony offered at trial supports the district court's finding that Goble had knowledge of and assisted these primary violations. Ward testified that Goble ordered him to enter the sham money market transaction in North American's books despite Ward's counsel that this would violate the regulations. Goble also directed Ward to complete the interim reserve computation after the sham transaction was on the books. Based on this interim reserve computation, Goble signed a wire transfer request to move money out of the reserve account.[9] These facts clearly show that Goble knew his actions surrounding the May 13th sham money market transaction would violate the books and records requirements and the Customer Protection Rule

---

[9] Goble contends that the court could not rely on this wire transfer because of spoliation of evidence. As we discuss below, we reject Goble's spoliation claim and the court was entitled to consider Goble's signature on the wire transfer.

19

and that he substantially assisted in the violation of these regulations. The district court did not err by finding him liable for aiding and abetting these violations.

C. Spoliation of Evidence

At the SEC's request a Receiver and a Securities Investor Protection Corporation ("SIPC") Trustee were appointed who had control of North American's books and records during the wind down of North American's operations. Goble alleges that after their appointment, and the district court's restraining order to preserve North American's records, he found twenty-five bags of shredded documents at North American's offices. He contends that these destroyed documents contained evidence that it was a customary business practice for him to sign off on wire transfers. Because the documents were destroyed, he maintains that spoliation of evidence occurred and that the district court failed to properly consider this claim.

"A district court's decision regarding spoliation sanctions is reviewed for abuse of discretion." *Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 615 F.3d 1305, 1313 (11th Cir. 2010) (citing *Harris v. Chapman*, 97 F.3d 499, 506 (11th Cir. 1996)). "[A]n adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (citing *Vick v. Tex. Emp't Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)). Goble has presented no evidence that the SEC destroyed the

20

documents contained in the bags or made intentional efforts to withhold evidence at trial. Because Goble did not demonstrate that the missing evidence resulted from the SEC's bad faith, we hold that the district court did not abuse its discretion by rejecting Goble's spoliation claim.

D. Injunction

The district court entered an injunction permanently barring Goble from the securities business and enjoining him from violating the securities laws. Goble challenges each of these restraints. "Our review is for an abuse of discretion, which occurs when 'the district court has made a clear error of judgment or has applied an incorrect legal standard.'" *SEC v. Ginsburg*, 362 F.3d 1292, 1304 (11th Cir. 2004) (quoting *Doe v. Chiles*, 136 F.3d 709, 713 (11th Cir. 1998)). We have explained that the SEC is entitled to an injunction if it can show a "reasonable likelihood" that the defendant will violate the securities laws in the future. *Id.* (citing *Carriba Air, Inc.*, 681 F.2d at 1322). We consider six factors when making this determination: "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities

for future violations." *Id.* (quoting *Carriba Air, Inc.*, 681 F.2d at 1322) (internal quotation marks omitted).

1. Lifetime Bar from Securities Business

Goble argues that the district court abused its discretion by restraining him from acquiring a securities license or engaging in the securities business because the SEC did not seek this relief either in its complaint or in the pretrial statement. This argument is unavailing. Federal Rule of Civil Procedure 54(c) states specifically that except in cases of default, a "final judgment should grant the relief to which each party is entitled, *even if* the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c) (emphasis added). While a limitation on this broad discretion may exist "where the failure to demand the relief granted prejudiced the opposing party," *Int'l Harvester Credit Corp. v. E. Coast Truck*, 547 F.2d 888, 891 (5th Cir. 1977) (citing *Sapp v. Renfroe*, 511 F.2d 172, 176 n.3 (5th Cir. 1975)), we need not resolve whether Goble was prejudiced by the SEC's failure to request the lifetime bar because we vacate this portion of the injunction. We vacate the district court's entry of this part of the injunction because the court relied on its conclusion that Goble committed securities fraud when granting the disbarment. We remand to the district court to consider in the first instance whether Goble's aiding and abetting violations standing alone warrant the lifetime bar when it applies the "reasonable likelihood" factors we

22

announced in *Ginsburg*. The court should afford Goble an opportunity to be heard on the propriety of this relief given that the SEC failed to request it.

2. Injunction Against Violations of the Securities Laws

The district court also restrained Goble from violating §§ 10(b), 15(c)(3), and 17(a) of the Exchange Act and the regulations promulgated pursuant to these statutes. Goble contends that these portions of the injunction must be vacated because they are impermissible "obey-the-law" commands, which violate Rule 65(d) of the Federal Rules of Civil Procedure. Before reaching this issue, we first vacate the portion of the court's injunction restraining Goble from future violations of § 10(b) and Rule 10b-5. We have reversed the court's judgment that Goble violated these provisions and "an injunction based upon an erroneous conclusion of law is invalid." *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996) (citing *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1520 n.21 (11th Cir. 1983)).

That leaves for our consideration the restraints against violating §§ 15(c)(3) and 17(a) and the accompanying regulations. We must decide whether an injunction that only uses the language of the securities statutes satisfies Rule 65(d). Given the importance of the text of the injunction to our analysis, we lay it out in toto. The district court enjoined Goble as follows:

Section 15(c)(3) of the Exchange Act and Rule 15c3-3. Defendant Goble is **PERMANENTLY RESTRAINED AND ENJOINED** from directly or indirectly (by use of any means or instrumentality of interstate commerce or of the mails) effecting transactions in, or inducing or attempting to induce the purchase or sale of, securities while in contravention of customer protection Rule 15c3-3, which requires a broker-dealer to maintain a customer reserve account with deposits in the amount computed in accordance with Rule 15c3-3a, in violation of Section 15(c)(3) of the Exchange Act (15 U.S.C. § 78o(c)(3)) and Rule 15c3-3 (17 C.F.R. § 240.17a-3).

Section 17(a) of the Exchange Act and Rule 17a-3. Defendant Goble is **PERMANENTLY RESTRAINED AND ENJOINED** from directly or indirectly failing to make and keep current accurate books and records relating to the securities business of North American or any securities firm in violation of Section 17(a) of the Exchange Act (15 U.S.C. § 78q(a)) and Rule 17a-3 (17 C.F.R. § 240.17a-3).

(R.8-261 at 2.)

Goble correctly identifies these paragraphs as an "obey-the-law" injunction and is rightly skeptical of their validity. As the name implies, an obey-the-law injunction does little more than order the defendant to obey the law. We have repeatedly questioned the enforceability of obey-the-law injunctions not only in the context of securities cases but other cases as well. *See, e.g.*, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (stating that injunction which only instructed defendant to "obey the law" would not satisfy the specificity requirements of Rule 65(d)); *Hughey*, 78 F.3d at 1531 ("[A]ppellate courts will not countenance injunctions that merely require someone to 'obey the law.'" (citing *Payne v. Travenol Labs., Inc.*,

24

565 F.2d 895, 897-98 (5th Cir. 1974))). Most notably, in *SEC v. Smyth*, 420 F.3d 1225, 1233 n.14 (11th Cir. 2005), we went out of our way to condemn these injunctions because they lack specificity and deprive defendants of the procedural protections that would ordinarily accompany a future charge of a violation of the securities laws.[10]

The SEC apparently recognizes that the district court's injunction does little more than order Goble to obey the law. Nonetheless, it maintains that in the context of violations of securities regulations an injunction that uses the statutory language is permissible. It raises three arguments to support this position. First, the SEC points to the Exchange Act itself which states:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, [or] the rules or regulations thereunder, . . . it may in its discretion bring an action in the proper district court of the United States . . . to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d)(1). It also relies upon the next subsection, which gives the district courts jurisdiction to issue injunctions commanding any person to comply with the

---

[10] For example, if the SEC suspects that the defendant has violated the obey-the-law injunction it may initiate a criminal contempt proceeding. And, at this proceeding, the defendant has no right to a trial by jury so long as the sentence imposed is less than six months. *See Frank v. United States*, 395 U.S. 147, 150, 89 S. Ct. 1503, 1506 (1969).

provisions of the Exchange Act. 15 U.S.C. § 78u(e). Second, the SEC rests on our decision in *SEC v. Carriba Air, Inc.*, 681 F.2d 1318 (11th Cir. 1982), where we said that "Congress specifically authorized an injunction to issue to prohibit the violation of the securities laws." *Id.* at 1321. Finally, the SEC says that injunctions sought by government agencies may be of greater breadth than those sought by private litigants.

Glaringly absent from the SEC's brief is any discussion explaining why the district court's injunction complied with the requirements of Rule 65. Rule 65(d)(1) states that "Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). We have never said that a court may simply ignore these requirements because it is entering an injunction in a securities case. While we upheld an injunction in *Carriba Air* that largely copied the language of the securities laws, we did not discuss whether the injunction complied with Rule 65(d), and the opinion provides no indication that this issue was raised by the parties.

As we mentioned in *Smyth*, one of the primary problems with obey-the-law injunctions is that they often lack the specificity required by Rule 65(d). As the Supreme Court has explained, the specificity requirements of Rule 65(d) are

"designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S. Ct. 713, 715 (1974) (citations omitted). An injunction "should clearly let defendant know what he is ordered to do or not to do. A court order should be phrased in terms of objective actions, not legal conclusions." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1203 (11th Cir. 2001) (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 984-85 (11th Cir. 1983)). But, "the degree of particularity required depends on the nature of the subject matter." *Id.* at 1204 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191-92, 69 S. Ct. 497, 499-500 (1949)).

Essentially, the SEC maintains that when the subject matter is securities an injunction may simply use the statutory or regulatory language of the securities laws. We reject the contention that Rule 65(d) provides the district court this discretion in *all* circumstances involving an injunction against violations of the securities laws. But, we also recognize that at times an injunction that orders a defendant to comply with a statute may be appropriate; Supreme Court precedent dictates this.

In *McComb v. Jacksonville Paper Co.*, the Supreme Court upheld a decree that directed the defendants to obey the minimum wage, overtime, and record keeping

27

provisions of the Fair Labor Standards Act. 336 U.S. at 191-95, 69 S. Ct. at 500-01. The SEC contends that *Jacksonville Paper Co.* validates the injunction here (including the portions of the injunction prohibiting violations of § 10(b) and Rule 10b-5). While the decree in *Jacksonville Paper Co.* may have ordered compliance with provisions of the Fair Labor Standards Act, *see id.* at 192, 69 S. Ct. at 500 ("By its terms [the decree] enjoined any practices which were violations of those statutory provisions"), the terms of that statute were relatively specific. For example, the defendant knew the exact wage it was being ordered to pay, it knew the required overtime pay rate, and it could easily discern the records it was required to keep. In other words, while the decree enjoined violations of the statute, the terms of the statute were specific, and the defendant clearly knew what conduct the injunction addressed.

The same cannot be said for all orders enjoining violations of the securities laws. For example, if an injunction simply used the language of § 10(b) of the Exchange Act or Rule 10b-5, a defendant reading the injunction would have little guidance on how to conform his conduct to the terms of the injunction. Indeed, that defendant would need to review hundreds of pages of the Federal Reporters, law reviews, and treatises before he could begin to grasp the conduct proscribed by § 10(b) and in turn the injunction. What's more, the judicial gloss on § 10(b) is not

fixed. In this very case, the SEC took (and the district court accepted) a very expansive view of the type of conduct prohibited by the statute. This ever-changing judicial landscape would further complicate a defendant's efforts to comply with an injunction that recited the language of § 10(b). While the securities context may be one where less particularity is required, we reject the SEC's implied contention that the injunction need not inform the defendant of precisely what conduct is forbidden.

The two restrictions before us present a different circumstance from a bare command to comply with § 10(b). The Customer Protection Rule (at § 15(c)(3) of the Exchange Act, 15 U.S.C. § 78o(c)(3), and Rule 15c3-3, 17 C.F.R. § 240.15c3-3) is not vague. The Rule sets forth specific, objective criteria for compliance. Firms subject to the Rule either have made the required reserve computation and set aside the required balance in a reserve account or they have not. The same can be said for § 17(a) of the Exchange Act, 15 U.S.C. § 78q(a), and Rule 17a-3, 17 C.F.R. § 240.17a-3.[11] Unlike a restraint on violating § 10(b) and Rule 10b-5, an injunction forbidding the violation of these provisions is similar to the injunction the Supreme Court upheld in *Jacksonville Paper Co.* Like the injunction there, these regulations contain specific commands and a defendant restrained from violating these commands

_____

[11] Indeed, in *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 517 (5th Cir. 1969), the former Fifth Circuit found that an injunction which required compliance with the records requirements of the Fair Labor Standards Act satisfied Rule 65(d).

29

would be able to determine what conduct the injunction addressed. Thus, while these restraints may be broad in terms of the scope of the conduct captured by the injunction, the "restrained party [has] fair notice of what conduct will risk contempt." *Hughey*, 78 F.3d at 1531(quoting *Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994)); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2955 (2d ed. 1995) ("Broadness encompasses the range of activity brought within the parameters of the decree; on the other hand, a decree is vague when the delineation of the proscribed activity lacks particularity.").

Permitting injunctions of some breadth in the context of civil enforcement actions brought by the SEC is warranted. The Exchange Act grants the district court broad discretion to enjoin violations of the Act. *See* 15 U.S.C. § 78u(d)(1). And, where the public interest is involved, the court's equitable power has a "broader and more flexible character." *Commodity Futures Trading Comm'n*, 541 F.3d at 1114 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S. Ct. 1086, 1089 (1946)). Therefore, a broad, but properly drafted injunction, which largely uses the statutory or regulatory language may satisfy the specificity requirement of Rule 65(d) so long as it clearly lets the defendant know what he is ordered to do or not do.

What is troubling about the district court's injunction in this case is that its restrictions merely cross-reference the relevant statutes and regulations. In other

words, the injunctions do not even meet the standard the SEC advocates by "track[ing] the statutory language." (Appellee's Br. at 47.) We have said that "[a] person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing." *Hughey*, 78 F.3d at 1532 n.12. But, we will not apply Rule 65(d) "rigidly," and we "determine the propriety of an injunctive order by inquiring into whether the parties subject thereto understand their obligations under the order." *Planetary Motion, Inc.*, 261 F.3d at 1203 (citing *Williams v. City of Dothan*, 818 F.2d 755, 761 (11th Cir. 1987)).

Plainly, Goble would need to look beyond the four corners of the district court's injunction in order to comply with its strictures. The mere cross-reference to provisions of the *United States Code* and *Code of Federal Regulations* does not specifically describe the acts addressed by the injunction. And, without a compendious knowledge of the codes, Goble has no way of understanding his obligations under the injunction. Accordingly, we vacate these portions of the injunction and remand for the district court to specifically describe the proscribed conduct within the four corners of the injunction.

In sum, we emphasize that an injunction prohibiting violations of the securities regulations must comply with Rule 65(d). In this case, we recognize that an injunction enjoining violations of §§ 15(c)(3) and 17(a) of the Exchange Act and

Rules 15c3-3 and 17a-3 may comply with Rule 65(d). We do so because these statutory and regulatory provisions specifically describe the acts required of the person enjoined. We also find that given Congress's authorization to enjoin violations of the Exchange Act and the fact that this is a civil enforcement action brought by the SEC, less particularity is required in this context. We caution, however, that in some instances an injunction which merely tracks the language of the securities statutes and regulations will not clearly and specifically describe permissible and impermissible conduct. When copying the statutory language does not specifically describe the acts restrained, the district court should craft terms that provide the defendant fair notice of what conduct risks contempt and clearly inform the defendant of what he is ordered to do or not do.

## IV. CONCLUSION

We affirm the court's judgment that Goble aided and abetted North American's violations of the Customer Protection Rule and books and records requirements of the Exchange Act. We reverse the court's conclusion that Goble committed securities fraud in violation of § 10(b). In light of this reversal, we vacate the portions of the court's injunction that bar Goble from procuring a securities license, engaging in the securities business, or violating § 10(b) or Rule 10b-5. We also vacate the portions

of the injunction addressing compliance with §§ 15(c)(3) and 17(a) of the Exchange Act because these paragraphs simply cross-reference the statutes and regulations.

We remand to the district court for it to consider in the first instance whether Goble's violations of the Customer Protection Rule and books and records requirements warrant the lifetime bar from the securities business. On remand, the court should also afford Goble an opportunity to be heard on the propriety of this relief. And, the court should draft an injunction addressing compliance with §§ 15(c)(3) and 17(a) that allows Goble to understand his obligations under the injunction.

AFFIRMED IN PART; REVERSED IN PART; VACATED AND REMANDED.