[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12765
Non-Argument Calendar

_____

D.C. Docket No. 1:16-cv-03298-SCJ

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

versus

WATKINS PENCOR, LLC,
MASADA RESOURCE GROUP, LLC,
DONALD V. WATKINS, P.C.,
DONALD V. WATKINS, SR.

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 28, 2020)

Before BRANCH, LUCK, and FAY, Circuit Judges.

PER CURIAM:

The Securities and Exchange Commission brought this enforcement action against Donald Watkins Sr. and his company, Masada Resource Group, LLC, following a series of emails in which they solicited three loans totaling $2,150,000 from former NBA player Charles Barkley.  Rather than use Barkley's money for the investment opportunities promised in those emails, Watkins and Masada used them for Watkins' personal gain.  They used Barkley's funds to pay the mortgage on Watkins' personal plane, credit card bills, and the alimony Watkins owed his ex-wife.  The SEC claimed that Watkins and Masada defrauded Barkley by making numerous misrepresentations in their emails to him.  Watkins and Masada, in response, maintained that the representations made in those emails were not fraudulent because Masada's operating agreement authorized Watkins to use Barkley's money in the way that he did.  The district court granted summary judgment in favor of the SEC, and against Watkins and Masada, concluding that there was no genuine issue of material fact that the representations in the emails were false, material, and made knowingly or with severe recklessness.  We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Watkins was a lawyer and businessman who, in 2005, became Masada's chief executive officer after its founder had passed away.  Masada was a company that supposedly had patents for technology capable of turning waste into fuel-grade ethanol.  Watkins explained that Masada's "business plan [was] to go around,

2

identify partners, qualified partners, execute the right contracts with them, and then to bundle those contracts and then sell them, along with [its] technology, to an operating company." Because Masada initially "was not in a position to pay" him, Watkins "deferred [his] compensation from Masada from day one." During his time as Masada's chief executive officer, Watkins pursued other efforts. He competed for "an NFL franchise opportunity" in Masada's name and attempted to sell Masada to Waste Management, Inc., a publicly traded company. Unfortunately for Watkins and Masada, neither venture was successful, and Masada, as of 2010, had yet to earn any revenue.

As a result, Watkins faced problems with his personal finances. In April 2010, for example, he sent a letter to a lender requesting forbearance on one of his personal loans, writing that his "personal income no longer allow[ed] [him] to comfortably service [his] debt under the current terms and conditions. . . . Due to income losses of prior years, [one of Watkins' other companies] [would] be in even less of a position to make loans to [him] in 2010." Moreover, his credit cards had been suspended, and he still owed his ex-wife alimony.

Around this time, Watkins solicited investments that he claimed were Masada-related from several individuals who had a financial interest in Masada,

including Barkley.[1]   Unknown to Barkley, however, Watkins would later use the

money he solicited to reduce the strain on his personal finances.

*The 2010 Note*

On May 8, 2010, Watkins sent Barkley and other investors emails soliciting

four $1,000,000 investments.  Watkins' email to Barkley, Glenn Guthrie (Barkley's

financial advisor), and Donald Watkins Jr. (Watkins' son) stated:

> We have an immediate opportunity to partner with Chip Rosenbloom and his family (owners of the St. Louis Rams) to secure long-term waste management contracts for a Masada waste-to-ethanol in [sic] Morocco. They can also facilitate a partnership with . . . Mexico's richest man[] for Masada contracts and projects in Mexico.
>
> . . . .
>
> I do not want to take private equity money to cover the development costs for these new opportunities.  We would have to give up too much equity in return and we have already planned the first of three Masada initial public offerings for later this year.  In short, because of all of the work we have done with Masada during the past 14 years, new equity partners coming in at this late date would get all of the upside in these transactions with very little downside.
>
> The best option for preserving our collective economic equity value is to borrow the $4 million needed to cover the development costs for this list of new countries from our existing stakeholders.  I have decided to invite you and three other financially secure Masada stakeholders to lend us $1 million each for 12 months.  In exchange for your loan, we would: (a) pay you interest at maturity at a rate of 10% per annum, (b) award you an additional 1% on your existing economic interest in the Masada companies, and (c) award you a 1% profits interest in each

---

[1] The two had met in Alabama years prior, and their relationship had further developed when Barkley invested in another one of Watkins' businesses.

facility to be built in Morocco, Mexico, Senegal, South Africa, and South Korea.

Two days later, Watkins emailed Barkley that he would "split the first $1 million for Morocco and Mexico until the other funds c[a]me in."

On May 14, 2010, four days after Watkins' initial email, Barkley agreed to provide $1,000,000 in exchange for a promissory note. The promissory note matured in one year and promised to pay Barkley the principal sum with interest at ten percent per year. Consistent with the May 10 email, the note also awarded Barkley an additional one percent on an existing economic interest he previously had in Masada-related entities and one-percent interest in any profits stemming from each facility built in Morocco, Mexico, Senegal, South Africa, and South Korea. Finally, the note provided that it "was made and transacted solely for business purposes related to Masada Resource Group, LLC."

The same day Watkins signed the note, Barkley wired approximately $1,000,000 to Watkins' bank account.[2] Immediately after receiving the Barkley wire, Watkins directed his son to make a series of outgoing wire transfers. The largest was for $750,000 and sent to Dan Meachum, who had previously loaned money to Watkins and the Masada entities. Watkins also wired $41,491.14 to the company that held the mortgage on his personal plane; $10,015 to a "House

---

[2] The day before Barkley's wire, Watkins' bank account contained less than $5,000.

Account," which he described as being for rent and expenses for his then-girlfriend's home in Atlanta; and $10,000 to his ex-wife in alimony.

*The 2011 Note*

On May 13, 2011, Watkins sent another email to Barkley seeking additional funds:

> As we gear up for the anticipated Masada-Waste Management transaction, we will be expending significant sums on [New York], San Francisco, and Atlanta investment bankers and lawyers. I had planned on borrowing $1 million for this special purpose from one of my commercial bankers later today or Monday. We will be repaying the loan at the closing of the [Waste Management] transaction. If you are interested in lending the money instead, we will borrow the $1 million from you at the same 10% per annum interest rate we are paying on your current loan. We will also pay you an additional $100,000 friendship kicker for the convenience of not having to undergo the lengthy commercial banking loan underwriting process and for the speed at which you execute your loan transactions. We will retire this special purpose at the closing of the [Waste Management] transaction or within 12 months, whichever occurs first.

Five days later, Barkley again agreed to provide $1,000,000 to Watkins in exchange for a promissory note. This note matured in a year, accrued interest at the rate of ten percent per year, and awarded Barkley $100,000 as a "loan service fee" on the maturity date. It further stated that it "was made and transacted solely for business purposes related to Masada Resource Group, LLC and affiliated entities/persons."

6

On May 23, 2011, Barkley wired $1,000,000 to Watkins' bank account.[3]  That same day, the following transactions occurred from Watkins' bank account: Drew Watkins (Watkins' other son) deposited a $7,000 check that had "Gift" written in the memo line; Watkins' ex-wife deposited a $50,000 check with the memo line "Partial Alimony"; his then-girlfriend received a $41,816 wire for the "House Account"; and a law firm deposited a $9,678.50 check.  On the next day, there were more transactions: another law firm deposited a $150,000 check for its work on litigation for another non-Masada company; he made two wires, one for $10,008.63 and the other for $11,904.80, for repayment of his personal loans; and he sent a $255,703 check to the United States Treasury to pay for his personal tax liability.

*The 2013 Note*

On May 24, 2013, Watkins sent Barkley an email asking for more funds:

> Earlier this week, I had to cover $600,000 in April and May expenditures related to . . . projects [in Namibia, South Africa, the United Kingdom, the United Arab Emirates, South Korea, and Turkey], including some substantial legal fees for Nabirm relating to the $10 million investment transaction currently being handled by Daniel Stewart & Company in London.  This was way more than we had originally budgeted in project-related expenses during this two-month period.  I paid all of these expenses, but these payments have left my office account far too thin for my personal comfort.  Plus, our June allotment of working capital will not hit my office account until June 1.
>
> Can you lend me $150,000 to cover my financial exposure between today and June 1?  I will be able to pay it right back to you shortly after

---

[3] The day before Barkley's wire, Watkins' bank account had a negative balance.

I return to the US.  If you can facilitate this personal request, please have [Guthrie] call [Watkins Jr.] and take care of it today (Friday). . . .

I have only approached you about this very personal matter.  Your demonstrated commitment to confidentiality with respect to our financial arrangements have made me feel comfortable enough to make this special request.

Shortly after sending the email to Barkley, Watkins sent an email to Watkins Jr. that outlined how the Barkley money was to be spent:

If Charles comes through, please pay your AmEx ($79,000), Jessica's[4] AmEx ($40,750.23) and My AmEx ($10,000).  Pay $2,000 more on my Visa and pay a one-month $2,500 for Jessica so that she can pay her personal bills.  Leave the rest in the office account for payroll and overdrafts.

I am working another source for the mortgage arrearage money ($150,000) and other bills ($50,000).  I will send that email out in a few hours.

We will climb out of this financial hole, but it takes a lot of focus and help.

A few days later, Barkley provided Watkins $150,000 in exchange for a promissory note.  The note "was made and transacted solely for business purposes related to Masada Resource Group, LLC."  Watkins' bank account statements showed that Watkins spent less than $300,000 in the two months preceding the May 24 email and that none of that money was for "Daniel Stewart & Company."  On the same day Barkley wired the money, Watkins made payments of $79,000 to Watkins

---

[4] "Jessica" refers to Jessica Findley, who worked with Masada and had a Masada email address.

Jr.'s American Express credit card bill,[5] $9,400 to his own American Express credit card bill, and $40,750.23 to Jessica Findley's American Express credit card bill.

*Procedural History*

In 2016, the SEC filed a complaint against Watkins and Masada.  The SEC alleged that they violated section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, by making material misrepresentations in their solicitations of Barkley's funds.

Two years into the litigation, the district court granted partial summary judgment in favor of the SEC, and against Watkins and Masada, finding that Watkins violated the Securities Act and the Exchange Act with respect to the three promissory notes, and Masada violated these provisions with respect to the 2010 and 2011 notes. After further litigation, the district court (1) held Watkins and Masada jointly and severally liable for disgorgement of $2,000,000 plus prejudgment interest, (2) held Watkins individually liable for an additional $150,000 plus prejudgment interest, (3) imposed a $1,450,000 civil penalty on Masada, (4) imposed a $450,000

---

[5] Watkins Jr.'s credit card statement for April 2013 contained a $915 charge for clothing or accessories at Hermes of Paris, a $2,800 payment to a media company that advertised Watkins Jr.'s insurance business, a $3,000 contribution to the University of Alabama Birmingham, a $5,000 charge for alimony to Deandra Watkins, a $757.74 charge for a mattress, a $21.98 charge for Watkins Jr.'s gym membership, a $58.25 charge for Watkins Jr.'s warranty on his personal residence, and charges for meals at various restaurants.

civil penalty on Watkins, and (5) permanently enjoined Watkins and Masada from further violating the antifraud provisions. Watkins now appeals.

## STANDARD OF REVIEW

We review a district court's order on summary judgment de novo. SEC v. Levin, 849 F.3d 995, 1000 (11th Cir. 2017). "In conducting our analysis, we construe the facts and draw all reasonable inferences in the light most favorable to the non-moving party." SEC v. Monterosso, 756 F.3d 1326, 1333 (11th Cir. 2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." Morton v. Kirkwood, 707 F.3d 1276, 1284 (11th Cir. 2013).

## DISCUSSION

On appeal, Watkins and Masada argue that: (1) there were genuine issues of material fact as to whether they made material misrepresentations; (2) the district court did not apply the correct summary judgment standard; and (3) there were genuine issues of material fact as to whether they made the material misrepresentations knowingly or with severe recklessness.

10

*Material Misrepresentations*

Watkins and Masada contend that Masada's operating agreement purportedly allowed Watkins to use the funds Barkley loaned him in any manner he chose. As a result, they claim that a genuine issue exists as to whether they made misrepresentations and, if they did, whether those misrepresentations were material.

For the SEC to succeed on its section 10(b) and Rule 10b–5 claims at the summary-judgment stage,[6] there must be no genuine issue of material fact that Watkins and Masada made "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) . . . with scienter." SEC v. Merch. Capital, LLC, 483 F.3d 747, 766 (11th Cir. 2007). Similarly, on its section 17(a)(1) claim, the SEC must show that there is no genuine issue of material fact that Watkins and Masada made "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) . . . with scienter." Id.

A misrepresentation is material if "a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." Id.; see also Carvelli v. Ocwen Fin. Corp., 934 F.3d 1307, 1317 (11th Cir. 2019) ("A misrepresentation or omission is material if, in the light of the facts existing at the

---

[6] "The scope of Rule 10b–5 is coextensive with the coverage of [section] 10(b)." SEC v. Zandford, 535 U.S. 813, 816 n.1 (2002).

11

time, a reasonable investor, in the exercise of due care, would have been misled by it." (internal quotation marks omitted)). "Course of action," in this context, means an "investment decision." Brink v. Raymond James & Assocs., Inc., 892 F.3d 1142, 1148 (11th Cir. 2018) (quoting SEC v. Goble, 682 F.3d 934, 943–44 (11th Cir. 2012)). "The Supreme Court has explained that materiality in federal securities law requires a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" Id. (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988)). The materiality requirement's purpose is "to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." Levinson, 485 at 234. "The question of materiality is not subject to a bright-line test but instead depends on the specific circumstances of each case." Carvelli, 934 F.3d at 1317 (citation omitted).

The representations Watkins and Masada made to Barkley shortly before the execution of the 2010, 2011, and 2013 promissory notes are the focal point of the SEC's action. The record is undisputed that the representations were patently false.

Despite the promise to use the loan money to secure long-term waste management contracts, to pay for attorneys and investment bankers to finish the Waste Management deal, and to reimburse Masada for projects in Africa, Europe,

12

and Asia, Watkins and Masada used the money for non-Masada expenses. They used the 2010 loan to refund another investor, pay the mortgage for Watkins' personal plane, pay for his alimony, and pay for his girlfriend's living expenses. Watkins spent the money from the 2011 loan on unrelated legal fees, his alimony, his girlfriend's living expenses, his personal tax liability, and his personal loan. As for the representations in the 2013 email, Watkins did not cover $600,000 in Masada expenses in April and May 2013, did not receive a significant allotment of working capital on June 1, 2013, and spent the $150,000 to pay off personal credit card bills. These misrepresentations were material as a reasonable investor would "attach importance" to the fact that Watkins and Masada used the funds loaned to them to pay for Watkins' personal obligations rather than for the lucrative opportunities represented in their emails.[7]  Merch. Capital, 483 F.3d at 766.

Watkins and Masada instead argue that Masada's operating agreement allowed them to use Barkley's money for "Masada purposes" and Watkins' personal debts, personal expenses, alimony, and tax obligations were Masada expenses. But this argument, as the district court correctly noted, "misses the point." Even if the operating agreement allowed Watkins to spend an investor's money on his personal

---

[7] For an example of what a reasonable investor would think is important, Barkley, in his deposition, indicated that his "biggest concern [was] that [Watkins] did not use the money to make [Masada] grow." When the SEC specifically asked Barkley whether he would have given Watkins money had he known that Watkins was going to spend the money on these personal expenses, Barkley responded, "No way."

expenses, it didn't allow him to lie to an investor about the reasons he was asking for money.  Just because he could spend the money for any reason he wanted, doesn't mean that he could get money by fraud and deceit.  The operating agreement was not a license to commit fraud.

### *The Correct Standard*

Watkins and Masada also argue that the district court applied the wrong summary judgment standard.  They maintain that the district court erred in not explicitly saying, as to the question of materiality, that there was no genuine issue of material fact.  This argument has no merit.  A review of the district court's order reveals that it applied the correct standard.  The district court correctly cited to Federal Rule of Civil Procedure 56(a) and stated that the party seeking summary judgment had to show that there was no genuine issue of material fact, that the movant had to be entitled to judgment as a matter of law, and that it would review the facts in the light most favorable to the nonmoving party.  The district court also made the explicit finding that Watkins' and Masada's "misrepresentations were indisputably material."  In any event, our review of the district court's order is de novo, and we have already concluded that there is no genuine issue of material fact on the materiality issue.

14

*Knowing Misconduct or Severe Recklessness (Scienter)*

Watkins and Masada finally argue that "scienter is completely disputed and negated" because "every action" they took was authorized by the Masada operating agreement. This is the same argument they made for why there were no material misrepresentations, but repackaged for the scienter element.

"Scienter may be established by a showing of knowing misconduct or severe recklessness."[8]   Monterosso, 756 F.3d at 1335 (quoting SEC v. Carriba Air, Inc., 681 F.2d 1318, 1324 (11th Cir. 1982)). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." Mizzaro, 544 F.3d at 1238 (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 n.18 (11th Cir. 1999)). The omission or misrepresentation must "present[] a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Carriba Air, 681 F.2d at 1324. The SEC can establish scienter through circumstantial or direct evidence. Monterosso, 756 F.3d at 1335. Although the question of scienter is typically left to the trier of fact, summary judgment is appropriate if no reasonable

---

[8] "Corporations, of course, have no state of mind of their own. Instead, the scienter of their agents must be imputed to them." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1254 (11th Cir. 2008).

jury could find that a defendant acted without scienter.  Id. (citing SEC v. Lyttle, 538 F.3d 601, 603–04 (7th Cir. 2008)).

There was no genuine issue of material fact that Watkins and Masada made the misrepresentations either knowingly or with severe recklessness.  The emails themselves show that Watkins and Masada knew or should have known that their misrepresentations presented an obvious danger of misleading Barkley into believing that they would spend his money for the purposes stated in the emails.

In the 2010 email, rather than asking for money to pay for Watkins' personal expenses, Watkins and Masada asked Barkley for an investment that would cover development costs for "new opportunities" with the owner of a professional football team and "Mexico's richest man."  Likewise, in the 2011 email, they asked Barkley for money for the "special purpose" of funding investment bankers and lawyers for the "anticipated" transaction with Waste Management rather than for the purpose of covering Watkins' personal obligations.

In the 2013 email, Watkins asked Barkley for money to allegedly cover "legal fees . . . relating to [a] $10 million investment transaction currently being handled." Watkins knew his misrepresentations were false because, immediately after sending it, he emailed his son with directions to use Barkley's money to pay off personal credit card bills as he needed this money to climb out of a "financial hole."  From this, the district court rightly observed that Watkins and Masada's "need to bolster

16

[their] misrepresentations" was "evidence that [they] deliberately misled [Barkley] because [they] knew [he] would not have invested if he knew the true use of the funds."

Watkins and Masada's only rebuttal to this evidence is to point to the operating agreement and argue that their misrepresentations were not made with scienter because they believed that the operating agreement allowed what they did. As we explained earlier, there is nothing in the operating agreement that can reasonably be read to allow Watkins to lie or defraud his investors about why he needed the money and what it was going to be used for. But even if Watkins unreasonably believed the operating agreement allowed his lies and deceit, at best his reading would be severely reckless, and he would still be liable under the Securities Act and the Exchange Act.

## CONCLUSION

For these reasons, the district court did not err in granting summary judgment in favor of the SEC because there was no genuine issue of material fact that Watkins and Masada made material misrepresentations or that they made those misrepresentations with scienter. We affirm.

**AFFIRMED.**

17